DANA B. OLNEY, APPELLANT, V. OMAHA AND COUNCIL BLUFFS STREET RAILWAY COMPANY, APPELLEE.

FILED APRIL 18, 1907.  No. 14,757.

1. Street Railways: USE OF STREETS. The right to use the streets of a city by the driver of a horse and the manager of a street car are equal, and each must use it with reasonable regard for the safety and convenience of the other.

2. ———: INJURY. Where the motorman in charge of a car sees, or by the use of reasonable care may see, that a horse is unduly frightened by his car, he must do what he reasonably can to prevent danger and damage; but, if the horse shows no signs of fright which are observable to him until too late to stop, he is not negligent in running into a horse which rears and alights immediately in front of the car.

3. Evidence examined, and *held* insufficient to submit to the jury.

APPEAL from the district court for Douglas county: WILLIAM A. REDICK, JUDGE. *Affirmed.*

*P. A. Wells,* for appellant.

*John L. Webster* and *W. J. Connell, contra.*

DUFFIE, C.

On or about May 29, 1903, a horse and buggy, belonging to the appellant, was being driven north on Twenty-Fourth street in South Omaha, on the west side of the

double tracks of the Omaha & Council Bluffs Street Railway Company, appellee. At a point between H and I streets there was a pile of lumber and a carpenter's bench, at which one Ruffner was at work on or near the sidewalk. The horse reached this point at or near the time a street car coming from the north on the west track was about to pass. The horse reared on his hind legs, and came down with his front feet in front of the car, and was so injured —one of its legs being broken—that he was shortly thereafter shot by a policeman on the street. The buggy and harness were also injured, and this action is brought against the appellee to recover the value of the horse and the damage suffered by the buggy and harness. In his petition the plaintiff alleges that the street railway company was negligent in the following particulars: (1) In running the car at a dangerous and high rate of speed, causing plaintiff's horse to become frightened and uncontrollable, and, although in full view of the motorman, he made no effort to slacken the speed of the car, but continued such speed until the horse was injured and the damage to the buggy and harness sustained; (2) that the motorman, seeing and knowing the danger in which the horse and buggy were placed by defendant's negligence, failed to diminish the speed of the car, and continued to run it at the high speed mentioned for a distance of one-half block after striking the said horse and buggy. Ruffner, the carpenter working at the bench, was a witness and testified that the car was running at the rate of 30 miles an hour. He did not observe the horse and buggy until the horse had reared in the air, and, consequently, cannot tell us of any indications of fright given by the horse prior to that time.

Mr. McIntire, the driver, is the only witness throwing any light on this question. In describing the accident, on his direct examination, he said: "Just before I got to H street, the horse became scared, watching the car. I was very careful to have him well in hand. When I saw he was scared, and just as the car got almost opposite, he

lunged across in front, and there was a general mix-up.
I went up in the air. I sprang just as the car struck the
horse and buggy together. I won't attempt to tell the way
I went. The bystanders said I went some 10 or 15 feet
in the air. I lit on my feet and stumbled and fell." He
further testified that the car dragged the horse and buggy
in the neighborhood of 50 feet after the collision occurred.
"Q. How were you driving the horse at the time just before
the accident occurred. A. On a walk. Q. How was the
horse acting at that time? A. As I stated before, he was
watching the car closely and showed signs of being scared,
and I was extra careful in holding a good rein on him."
On cross examination he testified as follows: "Q. Your
horse was coming along quietly? A. Yes, sir. Q. You
had no trouble with the horse until the car came right
down opposite the horse, as you say, or it got nearly to
the horse? A. Nearly so. Q. And then the horse suddenly
reared up, did it not? A. Yes, sir. Q. And it reared and
came down toward the east? A. Yes, sir. Q. That would
bring the horse, which had previously been on the west side
of the street, over on the track portion? A. Yes, sir. Q.
And just at the instant that the horse got there, that in-
stant the car struck him? A. It struck him and the buggy
together, the fore part of the front wheel. * * * Q.
You did not anticipate that the horse was going to rear
and go over on the track just in front of that motor, did
you, until he did it? A. If I had I would have jumped
from the buggy and turned him loose. Q. So you did not
anticipate the horse would do as ridiculous a thing as
that, did you? A. No, sir; I didn't. Q. And so far as
you know the motorman did not? A. I presume not. Q.
Because you were driving quietly along toward him and
he was coming toward you? A. Yes, sir. * * * Q.
He was moving quietly and all right until he made this
lunge? A. I stated he showed signs of being scared.
Q. That is, appeared a little nervous and working his
ears? A. His ears were standing forward directly, I

52

think, he was not looking back. Q. Well, then, that was his position, he was a little nervous and his ears were forward. Did he move along all right? You held this tight rein on him until he made this lunge? A. Yes, sir." After stating that he had driven horses ever since being old enough, that he was a strong man, about 42 years old, and sober, the following question was asked him. "Q. So there was not anything about you to attract the attention of the motorman, there was nothing wrong? A. No, sir."

The foregoing is all the material evidence relating to the situation just previous to the accident. On this evidence the trial court ruled that there was no showing of negligence on the part of the defendant company, and directed the jury to return a verdict for the defendant. Keeping in mind the rule that, where a verdict is directed for the defendant, the court should consider as established every fact which the evidence tends to prove, we are required to determine whether there was error in the direction of the court. There is no allegation in the petition that the motorman did, or by the use of diligence could have, observed that the horse was frightened in time to have brought his car to a stop prior to the collision. The only allegation relating to the negligence of the motorman is to the effect that, "after the car struck the horse and buggy, the motorman, both seeing and knowing the imminent danger in which the plaintiff's horse and buggy, as well as the occupant of said buggy, were placed by the negligence of the defendant, and having the power to stop said car, in absolute disregard of defendant's duty to stop said car, negligently failed even to diminish the speed of said car, but, on the contrary, said motorman continued to run said car at a great rate of speed for about the total distance of one-half block after striking and running into said horse and buggy." There is no evidence showing that the car could be stopped in a less distance than that alleged, or that the damage was occasioned by the failure to stop within a less distance. It is a well-established rule

that travelers upon the street have equal rights there with the street car company, and that each must so use the street as to avoid danger and damage to the other, and that either being negligent in that respect is liable for the damage occasioned. As stated in *Ellis v. Lynn & B. R. Co.*, 160 Mass, 341: "The rights of the driver of a horse and the manager of an electric car under such circumstances are equal. Each must use the street, and each must use it with a reasonable regard for the safety and convenience of the other. The motorman is supposed to know that his car is likely to frighten horses that are unaccustomed to the sight of such vehicles, while most horses are easily taught after a time to pass it without fear. It is his duty, if he sees a horse in the street before him that is greatly frightened at the car, so as to endanger his driver or other person in the street, to do what he reasonably can in the management of his car to diminish the fright of the horse, and it is also his duty in running the car to look out and see whether, by frightening horses or otherwise, he is putting in peril other persons lawfully using the street on foot or with teams. In this way the convenience and safety of everybody can be promoted without serious detriment to anybody."

If it had been alleged and shown that the motorman saw, or by reasonable diligence could have seen, that the horse was greatly frightened, in time to have brought the car to a halt before the accident, and that he failed to do so, that would have established negligence on the part of the company. There is no allegation to that effect in the petition, and the record is entirely barren of any evidence tending to show that the motorman had or could have had knowledge that the horse was unduly frightened until he got opposite, or nearly opposite. That the horse showed signs of nervousness could hardly be observed by the motorman at some distance away, unless it was of such a character as to attract the attention of those at a distance, and of this there is no evidence. A careful examination of the record convinces us that there was no case for

the jury, and that the court was right in directing a verdict.

We recommend an affirmance of the judgment.

ALBERT and JACKSON, CC., concur.

By the Court: For the reasons stated in the foregoing opinion, the judgment appealed from is

AFFIRMED.