THOMAS SALISBURY V. STATE OF NEBRASKA.

FILED DECEMBER 9, 1927. No. 25971.

*Hugh J. Boyle* and *William L. Dowling,* for plaintiff in error.

*O. S. Spillman, Attorney General,* and *Lloyd Dort, contra.*

Heard before GOSS, C. J., ROSE, DEAN, DAY, GOOD, THOMPSON and EBERLY, JJ.

EBERLY, J.

The defendant below, plaintiff in error here, was convicted on an information which, eliminating formal parts and surplusage, charged in apt language that on a certain public highway in Pierce county, Nebraska, on the 26th day of January, 1927, said defendant did operate a motor vehicle outside of any city or village at a "rate of speed greater than was reasonable and proper, having regard to the traffic and use of said highway at the place aforesaid, and having regard for the safety of the public, and did then and there so drive, propel and operate said automobile at a rate of speed so as to endanger the life and

limb of persons using and traveling said highway at the place aforesaid," and by reason thereof did unlawfully kill one Carl Eisenblatter.

This information is properly laid under the provisions of the motor vehicle act of Nebraska, sections 8364-8405, Comp. St. 1922. It further appears from the facts in the record that section 9546, Comp. St. 1922, has no application whatever to the offense which the proof may have tended to establish. The instructions of the district court, in general, were properly given on this theory. *Wallace v. State,* 91 Neb. 158.

The death of Carl Eisenblatter was, indeed, regrettable. That the automobile driven by the defendant caused his death stands admitted. The state concedes that the unfortunate occurrence was unintended on part of the accused, but insists that the death of Eisenblatter was due to the voluntary operation of this automobile by the accused at an unlawful speed as hereinbefore defined. The record fairly reflects the following facts: Salisbury is and was a nonresident of Nebraska. With his wife he had, prior to the 26th of January in question, been visiting at the home of friends in Pierce county, Nebraska. He owned and drove a Willys-Knight roadster. Because of needed repairs, he left his automobile at a shop in Norfolk. Nebraska, on the day of the accident. For his accommodation he was loaned a "Hudson speedster" at this shop for his use, while the repairs were being made on his own car. Neither with this particular car nor with the Hudsons, as a class, had he had any previous experience. From Norfolk, immediately after receiving this "car," he drove to the Zimmer home in Pierce county where his wife was visiting. About 6 o'clock that evening, in the automobile in question, he left the Zimmer home for the home of one Mr. Carsten. With him in the front seat of the automobile sat Mr. Zimmer; Mrs. Zimmer and his wife occupied the rear seat. A portion of the road traveled by the parties was north over the state highway No. 81, commonly known as the Meridian highway. At a place

on this road where it is practically level and straight, and with a well-maintained, smooth roadway, 20 feet wide in the clear, the accident occurred for which the defendant is now being prosecuted. Eisenblatter, then driving south on the same road, was approaching the scene of the accident with a four-horse team hitched abreast, attached to a wagon on which was loaded about 6,000 pounds of sand. He was walking on the near side of the wagon. Hitched as the left horse of the four was a stallion whose habits of shying and surging are established by the evidence beyond dispute. There is no evidence in the record that defendant was previously acquainted with either horses or driver. In the meanwhile the defendant had discovered, after starting on the trip, that one of the spark plugs on his car was "missing." He accordingly, from time to time, opened the cutout, disengaged the clutch, and sought by stepping on the accelerator and increasing the spark to clear the plug. There is no evidence in the record that this procedure was in any manner negligent or improper. At first the success of this effort was indifferent. But it appears that almost immediately before the accident the "missing" plug cleared up and suddenly began functioning. The undisputed testimony of defendant's witnesses is, that just prior to arriving at the place of the accident the speed of the car, which at no time was excessive or fast or of a racing nature, had been markedly reduced; that, when the defendant had finally succeeded in clearing the "missing" plug, he thereupon replaced the clutch and, at the same time, lifted his foot from the accelerator. The latter failed to respond. It seems that it had been caught and held so that the gas remained on. This, so far as the evidence discloses, was the first intimation that defendant had that the car he was driving was in any manner defective. But all plugs of the engine were now "hitting," and the result of the power of the engine, thus involuntarily applied, was that the car lunged forward, out of control, with instantly increasing velocity, and the suddenness of the increase of speed was so great

that the occupants of the car were unbalanced and thrown backward in their seats. Defendant grabbed at the "sticking" accelerator in a vain attempt to correct the defect and to thereby regain control of the car. Contemporaneous with this movement he discovered the approaching four-horse team then just passing from the bridge to the north of him between 40 and 50 feet distant. There is no evidence that at this time and, indeed, during the entire transaction, the defendant's automobile was in a position other than its proper place on the right (east) side of the highway in the direction it was proceeding. The evidence of the state tends to establish that Eisenblatter's wagon and horses, just previous to the collision, were as far to the west side of the highway as they could be driven. There is no evidence in the record from which it might be inferred that Eisenblatter at any time requested the approaching vehicle to be brought "to an immediate stop" by "putting up the hand" or otherwise.

It appears that the four horses abreast spanned approximately 10½ feet. The roadway was 20 feet wide in the clear, improved, and well maintained.

In view of the physical facts uncontroverted in the record, it seems there is no question but what there was then free space between the horses and east road boundary to afford the approaching auto sufficient room to pass. The danger inherent in the situation was, therefore, due to the propensity of the animals to scare and shy.

According to the evidence of defendant's witnesses, which is not expressly contradicted, as the surging automobile came within some 20 feet of the horses, it was first discovered by the occupants of the automobile that the latter were frightened. At about 12 feet, still nearer, the stallion (the east horse of the team of four), in its fright, suddenly lunged away from its team mates to the eastward and reared upon its haunches almost in the direct course of the approaching automobile. The witnesses describe him as appearing to be raised above the engine. At this the defendant spun his steering wheel to the eastward,

and his automobile, responding thereto, struck and severely indented the steel railing forming part of the approach. The impact between the "car," "stallion," and the steel railing was evidently almost instantaneous, though exact order cannot be ascertained by the record. It seems that darkness, possibly terror, rendered a more complete account impossible. The first disinterested witness to reach the scene found the stallion dead lying about 15 feet due north of the wagon on the west side of the road. The deceased was lying immediately north of his wagon, between it and the dead horse, with his body in a north and south position, mortally wounded. The left front wheel of the wagon was crushed; two of the horses had broken away and disappeared. A third, the one hitched next to the stallion, was standing with blood marks upon him, and one hoof torn off. The automobile had stopped about 10 to 12 feet from where it struck the steel railing, with its rear wheels in line with the rear wheels of the wagon. It was within a foot or two of the east side of the road. Both front wheels of the automobile were wholly destroyed. The radiator and the left lamp had been badly crushed in, and the left fender had been bent back by the force of the impact. The right fender appeared but little injured, and the right lamp was intact and remained lighted until turned off after the accident. The engine was running, the accelerator still "stuck," but the clutch was in neutral.

The defendant now challenges the sufficiency of the evidence contained in the record, and insists that the district court erred in giving and refusing to give certain instructions. In considering these contentions, it must be kept in mind (a) that, as a general rule, direct testimony is not essential to warrant a jury in finding that an automobile was operated at an excessive speed. Evidence of the force of the impact of the collision may, by itself, or in connection with other circumstances, be of sufficient weight to warrant a jury in finding negligence as to speed; (b) if evidence in the case, either direct or circumstantial, or any material part thereof, is fairly susceptible of two

constructions, one in favor of the state, and the other in favor of the defendant, the doubt must be resolved in behalf of the innocence of the accused, as every intendment or inference under the evidence, considered in its entirety, must be construed in his favor. *Bourne v. State, ante,* p. 141.

The state, in view of the conceded fact that the accelerator stuck just before the accident occurred, offers little, or no, convincing, direct evidence on the subject of the speed of defendant's car. The sole, direct evidence on the subject is from a single witness who testified that, at and prior to the accident, he was in his field about 40 rods north of the bridge on this highway, and approximately 2 rods from the road; that he heard a car coming from the south, and it sounded as though the cutout was open, and the car running fast; that he heard the crash of the accident which occurred just south of the bridge above referred to; that he looked south towards the source of the sound and he saw one automobile light still burning; that he went down the road to the wreck and found the car. At the time he started for the scene of the accident, the engine of the car, which had not stopped running, was still making considerable noise, but later was shut off by some one, and that the light went out before he arrived at the place of the wreck. This witness also said that he first heard this automobile coming "somewhere around Ulrich's place," which he "judges was better than a half mile" south of the scene of the accident, and that it was between a minute and a minute and a half from the time he first heard the coming automobile until he heard the crash of the collision. Witness, if correct, was, at the time he first heard the approaching automobile, more than 3,400 feet north of the approaching car. Disregarding the time required for the transmission of sound to him (approximately 1,100 feet a second), and assuming his judgment to be accurate and correct, it discloses that the average speed of defendant's car, after this witness first heard its approach, was not in excess of 20 or 30 miles an hour.

It would seem, indeed, that if this be considered to be as an unvarying speed, and over a portion of a straight, well-improved, 20-foot highway, then otherwise unoccupied and not in.use, and especially in view of the fact that violation of the provision of our statute governing the speed of an automobile in approaching a bridge, or passing another vehicle, is not a part of the charge, it would hardly be subject to just criticism, let alone be made the basis of a criminal complaint.

Unfortunately, this witness' testimony does not attempt to state that the speed was uniform. His facts, if correct, indicate simply the average speed, or the time occupied by the automobile in covering the distance of approximately a half mile. In view of this fact, we must remember that a driver is quite able to control and change the speed of an automobile at different points in the distance he may be traveling. Therefore, the facts testified to by this witness would afford little or no basis for determining the speed of this car at the time immediately prior to the collision or at the time of impact. *People v. Barnes,* 182 Mich. 179.

But, at least, it must be conceded that there is no evidence of criminal negligence or of any improper operation of the car until it arrived at the approach of the bridge where the accident occurred. As to what occurred thereafter, a careful consideration of the record, in the light of the presumptions to which the defendant is entitled, compels the conclusion which may be thus summarized: That due to the sudden development of the defects of the accelerator of the strange automobile which first became apparent at a point not exceeding 50 feet from the team approaching on the highway from the north, while the accused was proceeding therein at a lawful speed, in a proper manner, on and over a portion of the public road over which he was lawfully entitled to travel and occupy for such purpose, the speed of the car was momentarily out of control, or not controlled by the defendant; that at this instant the stallion driven by deceased, due to fright and to habit, which must have been known to deceased, also

became out of control, or, at least, was not controlled by the latter; that the lack of exercised control of the automobile's speed on part of the accused, and the lack of exercised control over the stallion's bolting on part of deceased, jointly and equally constitute the proximate cause of the unfortunate results which followed. The record furnishes no proof that, in the absence of either factor last mentioned, the accident would have occurred.

If, therefore, criminality exists in this case, it must be wholly due to a lack of success on part of the accused in his efforts to regain and to exercise proper control of the defective automobile between the time of the discovery of the approaching team and the impact of the collision that followed. If we take as the basis of our investigation 44 feet a second as the speed rate of 30 miles an hour, and 30 feet a second as the speed rate of 20 miles an hour, the true narrative of the facts in this record must be told in a story of "split seconds." To summarize: From the concurrent discovery of the approach of the four-horse team, and the development of the defect in the accelerator, with the thereafter sudden, constant, and progressive increase of velocity of the automobile to instant of impact, probably less than a second intervened—not time for more than a single heart-throb; from discovery of fright among horses, less than a half second; from the surge of the white stallion in front of the oncoming automobile to instant of impact would be measured by fifths of a second.

Based upon these facts, the defendant was convicted, not for what he did, but rather for what he failed to do— release the clutch, cut off the spark, apply the brakes, stop the automobile, and thus prevent an impending collision between, for the instant at least, a bolting unmanageable horse, and a bolting, uncontrollable car.

Under the peculiar facts of this record, this horse and this car present many characteristics in common.

As to the horse, it seems this court is committed to the rule that the driver of a horse which suddenly becomes unmanageable, bolts, and escapes from control is not, be-

cause of these facts, alone, civilly or criminally liable for the results which follow, or the damages which ensue. *Brooks v. Kauffman,* 93 Neb. 682. Such, indeed, is the modern form of the general rule: *Rowe v. Such,* 134 Cal. 573; *Creamer v. McIlvain,* 89 Md. 343, 6 Am. Neg. Rep. 547, 45 L. R. A. 531, 73 Am. St. Rep. 186; *McGahie v. McClennen,* 86 App. Div. (N. Y.) 263; *Gray v. Tompkins,* 15 N. Y. Supp. 953; *Coller v. Knox,* 222 Pa. St. 362, 23 L. R. A. n. s. 171; *O'Brien v. Miller,* 60 Conn. 214, 25 Am. St. Rep. 320; *Button v. Frink,* 51 Conn. 342, 50 Am. Rep. 24; *Cunningham v. Belknap & Co.,* 22 Ky. Law Rep. 1580; *Blue Grass Traction Co. v. Ingles,* 140 Ky. 488.

In *Olney v. Omaha & C. B. Street R. Co.,* 78 Neb. 767, a somewhat different phase of the question before us was then before this tribunal, and was determined in a manner not adverse to plaintiff in error herein.

*Brooks v. Kauffman, supra,* was a civil action to recover damages occasioned by a runaway team colliding with a vehicle preceding it. It was contended that "if the defendant had been driving carefully he might have driven his team into an irrigation ditch," and thus avoided the collision. This court answered the contention by saying that, under the circumstances of that case, there could have been no time immediately preceding the accident for the defendant to balance probabilities in his mind, and to determine his course, and that actionable negligence was, therefore, not evidenced by his failure to do "what he might have done." The time available to the defendant in that case to balance probabilities was, at least, a hundred per cent. greater than in this.

It would seem, therefore, that the operator of an automobile which, solely because of mechanical defects, theretofore unknown, becomes suddenly out of control is plainly within the reason of the rule which is applied in this state to uncontrollable teams.

It follows that the law under which this complaint is filed does not require a finding for the state, if the defendant could have stopped the car, without limiting his efforts

in stopping to the duty of reasonable care, in view of all the circumstances which surrounded and made up the transaction, and particularly in view of the limitations as to time; and that the accused is not liable, under the terms of the statute, for what he could not reasonably prevent or avoid.

We have not forgotten the fact that the physical evidences of the wreck, under some circumstances, might afford ample evidence for the conviction. However, in view of the surrounding facts and circumstances in this case, nothing in the way of proof appears from it to establish the guilt of the defendant before us.

We conclude, therefore, that the evidence adduced in this case is insufficient to sustain the conviction, and the judgment and sentence of the district court is reversed and the cause remanded for further proceedings.

REVERSED.