OTILLIA CREAMER AND JOSHUA CREAMER *vs.* JOHN McILVAIN AND JAMES W. KEMP.

*Negligence—Injury Caused by Horses Running Away—Evidence.*

No inference of defendant's negligence can legitimately be drawn from the mere fact that horses driven by him ran away and caused an injury, when there is no evidence that he was an incompetent driver, or that the horses were vicious or unruly, or of the circumstances under which they ran away.

If horses, which had previously been gentle and easily managed, show signs of becoming unruly while being driven, negligence cannot be charged to the driver merely because he does not discontinue that drive.

Defendant, a competent horseman, was driving a pair of horses with which he was well acquainted along a country road, when one of them became frightened and caused the other also to run away, and the vehicle collided with plaintiff's vehicle, which was going in the same direction, causing an injury. The horses were gentle and had not run away since they were colts, five years previously, when they ran because the yoke-strap holding the pole broke, and the pole dropped. At an earlier time on the same day, the horses, when

being driven by another person, had gotten beyond that person's control for a moment because one of the reins was dropped. *Held*, that there was no legally sufficient evidence of negligence on the part of the defendant to entitle plaintiff to maintain the action.

Appeal from the Court of Common Pleas (HARLAN, C. J.)

The cause was argued before McSHERRY, C. J., FOWLER, BOYD, PEARCE and SCHMUCKER, JJ.

*George Savage* (with whom were *W. Cabell Bruce* and *Wm. R. Barnes*, on the brief ), for the appellant.

The circumstances which led Kemp to suggest that the horses be left at Halstead's, were sufficient to put McIlvain, at any rate, upon knowledge of the fact that the horses were prone to run away; and if he recklessly brushed aside Kemp's suggestion, and took, as he said, the chances, after knowledge of this propensity was brought home to him, he should be justly held responsible. With reference to the *scienter* in cases of this sort, the rule is, that it is sufficient if the defendant has seen or heard of things which would suffice to convince a man of ordinary prudence that the animal was ill-disposed. McIlvain had knowledge, according to his own testimony, of the proneness of at least the off or left horse to run away when frightened by an electric car, and said : "In going down there and turning into Halstead's, he made rather a short turn, we will admit, but there happened to be at the same time a car coming on the other side and the off-horse seemed to shift into the porch, and in doing so pulled Mr. Kemp, and in doing so pulled one wrap off one of his hands ; I particularly noticed that. because I was on the eve of taking the lines, and again he testified that, after leaving Halstead's the off-horse again took fright at an electric car coming down behind and plunged, with that the near horse started and then both horses started in a run." *S. & R. on Neg.*, sec. 630, 5th ed. Knowledge of bad conduct in other instances, or in another

instance, enough. *Arnold* v. *Norton*, 25 Conn. 92 ; *Kitt-ridge* v. *Elliott*, 16 N. H. 77 ; *Loomis* v. *Terry*, 17 Wend. 496 ; *Cockerham* v. *Nixon*, 11 Iredell Law, 269 ; *Buckley* v. *Leonard*, 4 Denio, 500 ; *Mann* v. *Weiand*, 81½ Pa. St. 243. Slight circumstances are sufficient to establish the *scienter*. Marks on a stable panel evidence of knowledge of propensity of horse to kick. *Simson* v. *London, etc., Omnibus Co.*, L. R. 8, C. P. 390. Mere fact that dog was tied, sufficient evidence of knowledge to go to jury. *Goode* v. *Martin*, 57 Md. 606.

It is immaterial if McIlvain had no previous knowledge of the propensity of the horses to run away, except what he acquired upon the same drive. Had he heeded Kemp's suggestion, and not rashly speculated in the chances of life and limb, the accident would not have occurred. But Mc-Ilvain's statement to Kuhlman, "we had no business driving the horses," that is to say, horses that he had frequently driven behind before, necessarily refers to knowledge acquired on previous drives. If, when he started from Baltimore that evening, there had been nothing to apprize him that the horses were unsafe, why should he have made such a remark? A man certainly "has business" driving behind horses that he has reason to believe are safe, and it is a strained construction to limit the application of such a remark to the occasion on which the accident occurred.

*Edgar H. Gans* and *Vernon Cook* (with whom was *B. H. Haman* on the brief), for the appellees.

The mere fact that a horse ran away is not, *per se*, evidence of negligence—certainly not when the cause of the runaway is shown, and when that cause is something beyond the control of the defendant. In order to recover under such circumstances the plaintiff must show either that the runaway was caused by some negligence on the part of the defendants, or that the horses were prone to run away. Now, by the uncontradicted evidence here, the runaway was caused by the unusual noise and buzzing sound made by the electric

car. There are many parallel cases in the books. 2 *Shearman & Redfield on Negligence*, 647 ; *Benoit* v. *Troy*, 154 N. Y. 225 ; 3 *Am. Neg. Rep.*, 717 ; *O'Brien* v. *Miller*, 60 Conn. 214 ; *Holmes* v. *Mathir*, L. R. 10 Ex. 261 ; *Manzoni* v. *Douglas*, L. R. 6 Q. B. Div. 145 ; *Herrick* v. *Sullivan*, 120 Mass. 576 ; *Gottschalk* v. *Bernheimer*, 6 Daly, 212 ; *Unger* v. *42nd St. Ry. Co.*, 51 N. Y. 499 ; *Sullivan* v. *Scripture*, 3 Allen, 564.

In *Benoit* v. *Troy*, boys threw snow-balls at a horse, and caused it to run away and injure the plaintiff. It was held that the driver was not liable. In *O'Brien* v. *Miller*, the cause of the runaway was unexplained, and the mere fact of a runaway was held not negligence. In *Holmes* v. *Mathir*, the horse was frightened by the bark of a dog, and the defendants were held not liable. In *Manzoni* v. *Douglas*, the horse bolted without any apparent cause, and this was held no evidence of negligence. In *Herrick* v. *Sullivan*, the horse was left standing near a railroad train, took fright and ran away ; held, no evidence of negligence. In *Gottschalk* v. *Bernheimer*, no explanation could be given, and the fact of a runaway was held not evidence of negligence. In *Unger* v. *42nd St. Ry. Co.*, it was held that a runaway unexplained might be a *prima facie* case of negligence, but that when the cause of the runaway was shown by defendants' witnesses to have been that a drunken man struck the horse, then the defendant must be held not liable. Again, in *Cadwell* v. *Arnheim*, 152 N. Y. 184, it is laid down that a driver is not bound to keep his horses absolutely under control, or to guide them in case of a runaway.

From the above authorities, it is clear that a driver or owner of a horse is not liable for an accident caused by the running away of his horse, unless that runaway was caused by some negligence on the part of such driver or owner. The mere fact of a runaway is not, *per se*, evidence of negligence on the part of the driver, because a horse may, and often does run away through causes other than the driver's negligence, and if the defendants' evidence shows the cause

of the runaway to have been something other than the driver's negligence, then the plaintiff cannot maintain any action  The cause of this particular runaway is shown by the uncontradicted evidence to have been not any negligence of the defendants, but the unusual noise of the electric car for which, under the law, they cannot be held liable. We therefore submit that there was no evidence of negligence under the first count of the declaration. The law makes no presumption in such a case, and not a single eye-witness of the accident testifies for the plaintiff. The only argument which the appellant can make is based on certain alleged facts as to the manner of driving half an hour earlier, and this, as we have already fully shown, is for several reasons entirely insufficient to take the case to the jury.

The appellants will cite many cases relating to dogs, cats or bulls, which hold that if such an animal is shown, out of pure viciousness of nature, to have bitten one person, that this, if brought home to the knowledge of the owner, is sufficient to hold him liable for any injury caused by a second bite. Such a rule, however, is not applicable to horses. This question is fully discussed in *Benoit* v. *Troy*, *supra*. There, the horse in question had run away ten days before the day on which it ran away the second time, and injured the plaintiff. The Court says the cases are frequent where actions have been maintained for injuries resulting from the bite of dogs, the biting or kicking of horses, the goring of bulls or other animals. Are the owners of horses to be held to the same rule in the case of a runaway ? We think not. " The use of horses is very general. That they may on an occasion escape from the control of their driver and run away is not uncommon. Must the owner, after such an occasion, stop using them, except under the onerous burden of absolute liability if they shall run away a second time and cause injury ? It may be admitted that horses that have once run away are less safe thereafter. This may bear upon the degree of care which should be exercised by the owner, but does it place the

horses under the ban of the law and make the owner liable, in the absence of negligence, if he uses them thereafter !'' The Court then concludes from the evidence that the cause of the runaway on both occasions was fright, and that this did not justify the submission to the jury of the question whether the horses were vicious or dangerous or unsafe to be used on the public streets.

To show that a horse is prone to run away there must be evidence of a fixed habit; one or two previous instances are not sufficient. *Kennon* v. *Gilmer*, 131 U. S., 24; *Magi* v. *Cutts*, 123 Mass. 537; *Benoit* v. *Troy*, 154 N. Y. 225. Even in the case of a dog we submit that if it had in previous cases bitten persons, not out of viciousness, but under circumstances which might make any dog bite, as, for instance, when itself attacked, then such a biting would not be sufficient to hold the owner liable in a subsequent case. Now, here the cause of the single previous runaway is fully explained and shown not to be the result of any viciousness or unreasonable fear and timidity, but from hearing a report like a pistol immediately beside them.

We must bear in mind the uncontradicted evidence of the numerous witnesses of the defendant who testify as to the general character and behavior of these horses. In fact, their whole life-history is laid before the Court, and it is established by uncontradicted evidence that never, from the time they were fully broken, up to the moment of this accident, had they ever run away or given the slightest indication of any desire to do so.

As to the conduct of the horses half an hour before the accident at Halstead's, they certainly did not run away then, and defendants had a right to consider the life-history of the horses, which showed them to be quiet and gentle. It would be most unreasonable to say that, because of *some momentary* excitement, the defendants must cease to drive the horses, or else drive them at their peril. Even had they been left at Halstead's over night and given a rest, they would have been more spirited in the morning than they

could have been that evening after their long drive.   By
the appellants' contention the defendants would practically
have been compelled to leave these horses at Halstead's
indefinitely, if not permanently, and this *reductio ad ab-
surdum* sufficiently disposes of the appellants' argument
on this branch of the case.

Boyd, J., delivered the opinion of the Court.

The appellants sued the appellees for injuries sustained
by Mrs. Creamer as the result of the horses, drawing a
vehicle occupied by the appellees, running into one in which
the appellants were riding.   There are two counts in the
declaration—the first alleging that " the defendants, because
of their negligence and incompetency to properly drive
horses, so negligently and unskilfully managed a team, by
which they were being conveyed in the same direction, that
said team struck the vehicle in which the plaintiffs were
seated," and the second, that " a vehicle under the manage-
ment of the defendants, and drawn by two horses, which the
defendants knew to be prone to become uncontrollable and
to run away, ran into and struck the vehicle in which the
plaintiffs were seated, with great violence, said horses having
become uncontrollable, and ran away because of their
proneness to become uncontrollable."   At the trial of the
case the Court below granted two prayers—the first in sub-
stance instructing the jury that there was no evidence leg-
ally sufficient to entitle the plaintiffs to recover under the
first count, and the second being to the same effect as to
the second count.   Having stated the two grounds for
recovery relied on by the plaintiffs, we will consider them
in the order they are presented in the declaration.

1. The evidence shows that Mr. Kemp was the owner of
the horses and the vehicle, in which he and Mr. McIlvain
were riding.   They had been taking a drive and were re-
turning to the city of Baltimore by way of the Pimlico
Road.   Mr. Kemp drove until they reached a house on the
roadside, known as " Halstead's," where they determined to

stop.    Before reaching Halstead's, from the direction they were coming, the road on the right was made of soft dirt, the middle being macadamized, and there being an electric railway on the other side.    There was some difference of opinion between the witnesses as to the speed of the horses as they approached and drove into Halstead's, but the evidence on the part of the plaintiffs was, for the most part, to the effect that they were moving very rapidly—so much so that some of the witnesses thought that at least one of them was running as they turned into that place.    The testimony of several was that Mr. Kemp, who was driving at the time, lost control of the horses and dropped one of the lines, and although that was denied by the appellees, who undertook to explain how one of the lines came off Mr. Kemp's hands, it may well be conceded that if the injury complained of had happened as they approached or drove into Halstead's, the alleged negligence of the appellees—certainly of Mr. Kemp—would necessarily have been a question for the consideration of the jury.    For, although it is shown that it is customary for those driving fast or spirited horses to "speed" them on that dirt road, it is a part of the public road and if persons drive at such rate as the testimony shows these parties were driving on the road and as they went into Halstead's, which is a place of public resort, it would not have been within the province of the Court to say that there was no evidence of negligence, if a collision had occurred by reason of such fast driving at those points, as is disclosed by the record.    But the accident did not happen there. The appellees, after having had their horses taken in charge by the hostler, went into the house and remained there some time.    Mr. Creamer said he and his wife remained there probably five minutes after the appellees arrived; that they then drove a short distance out the road when they turned and drove towards the city.    Mr. Kemp testified they stayed there "some little time" before starting, and Mr. McIlvain said he supposed it was ten or fifteen minutes.    When they started Mr. McIlvain drove, accord-

ing to the evidence of Mr. Kemp and himself, because the former was not well and was suffering from a pain in his side.   After going down the road about a half mile one of the horses became frightened at an elecric car, which was making an unusual noise, and jumped against the other horse and the two started to run.   When they were about three-quarters of a mile from Halstead's they ran into the vehicle which the appellants were driving, which caused the injury complained of.   From the time they left Halstead's there is not a particle of evidence of negligence on their part.   It is true that one of the witnesses for the plaintiff said, in speaking of their leaving Halstead's, that "They went off in a kind of a flurry."   Just what he meant by that is not very clear, but in speaking of the way they came into Halstead's the same witness said "they came in with a little flurry, that is, a little extra," but he also said "I don't think they came at a very fast rate of speed; as far as the rate of speed they came in is concerned, they came in as a pair of spirited horses," but his opinion was that they did not know "how to handle horses."   Mr. McIlvain said, "I drove from Halstead's and they acted very gentle with me."   Although some of plaintiffs' witnesses thought that the horses were not properly managed as they entered Halstead's, the uncontradicted testimony shows that at that time Mr. Kemp was driving, whilst Mr. McIlvain drove after they left that place and was driving when the accident happened.   Nor was it attempted to be denied that Mr. McIlvain had been driving horses constantly for ten or twelve years, and had frequently driven those which caused this accident.   No evidence was offered even tending to prove that either Mr. Kemp or Mr. McIlvain was not a competent driver, excepting the opinions of some of the witnesses formed from the manner in which the horses were managed as Mr. Kemp drove into Halstead's, and one of the plaintiffs' witnesses said that he could not form an opinion as to whether a man is a careful and prudent driver by seeing him drive once.   But, if it be conceded that he was

incompetent, there was no attempt to show that Mr. McIl-vain was and, as we have already said, there is no evidence of negligence after they left Halstead's, where he commenced driving.   We can therefore have no hesitation in reaching the conclusion that the Court was right in granting the defendants' first prayer.

2. The plaintiffs did not offer any evidence as to the proneness of the horses to run, excepting what occurred at Halstead's, and the testimony of Mr. Kuhlman, who spoke of an alleged admission by Mr. McIlvain, which we will refer to later on.   When Mr. Kemp was on the stand, however, he said that " on one occasion, not after they were broken horses, but when they were a pair of colts, not three years old (I had not had them in harness more than three times, I don't think), I started out from the place with them, my sister being with me, and we were crossing over a bridge and that shook the pole and the yoke-strap broke and the pole dropped down and made the report of a pistol or a gun going off, naturally the colts took fright and ran ;" " that was between five and six years before the accident in question, after that I never had the slightest bit of trouble with them, they never showed any sign of fright or tried to run away up to the time of that accident. " It is contended that their running then was some evidence of their proneness to run off, but even if it be conceded that the mere fact that a horse has run away once may be some evidence of its disposition to run, if there be no explanation of the circumstances, the one occasion shown by the record is so fully explained that it is impossible to find, or even to infer, from that that there was any tendency in them to run.   A colt that would not run under the circumstances described would be an exception.   The testimony offered on the part of the defendant, which is uncontradicted, shows beyond all question that from that occasion until the day of the accident complained of they were gentle and easily managed. A sister of Mr. Kemp had driven them since she was fifteen years of age, and although when in the city she usually had

a companion, which, to use her language, "was simply a matter of taste with me that I did not drive alone in the city," she did drive them alone or with a lady companion in the country. One witness, apparently experienced in the use of horses, spoke of them as " perfectly gentle but spirited horses;" another who had driven them said " there was not the slightest indication of their trying to run away;" another, who had ridden behind them a number of times, said : "They never showed any disposition whatever to run away or any signs of viciousness of any kind," and still another testified "they were perfectly quiet and gentle." The record therefore not only fails to show any proneness in the horses to run, excepting on the one occasion spoken of when they were under three years of age, but there is abundant affirmative proof of a contrary disposition. If horses must be kept off the public highways because they ran away when colts, under such circumstances as those described, our streets and public roads would soon have to be given up to horseless vehicles, for no one would be safe in the use of horses if he must be held responsible for an accident simply because they ran away when colts under such conditions as those spoken of. We do not understand that any of the authorities go to such a dangerous length, and we will briefly consider some of those cited by the counsel for the respective parties to this case.

In *Arnold* v. *Norton,* 25 Conn. 92 ; *Kittridge* v. *Elliott,* 16 N. H. 77 ; *Loomis* v. *Terry,* 17 Wend. 496 ; *Buckley v. Leonard,* 4 Denio, 500, and *Mann* v. *Weiand,* 81½ Pa. St. 243, cited by the appellants, the liability of the owners of dogs was under consideration and, although in some of them it was held that there is no rule which requires any particular number of instances of unprovoked biting to prove a mischievous disposition in a dog to bite mankind, and that one instance might be sufficient under some circumstances, they do not go to the extent of holding that one such attack by a dog would be sufficient evidence of such disposition if the facts disclosed that the dog was provoked or that the

biting was under circumstances that would not indicate a mischievous propensity. We will not stop to emphasize the fact that in all those cases dogs, and not horses, were being considered, or to comment on the distinction made in the authorities between dogs and horses. In *Cockerhan* v. *Nixon*, 11 Iredell's Law, 269, which was a case of a bull injuring the plaintiff's horse, it was held that when the owner of an animal knows or has good reason to believe that he is likely to do mischief he must take care of him, and that it makes no difference whether the ground of suspicion arises from one act or from repeated acts, but it was also said that the act done must, however, be such as to furnish a reasonable inference that the animal is likely to commit an act of the kind complained of. In *Simson* v. *London General Omnibus Company*, L. R. 8 C. P. 390, the plaintiff was a passenger in the omnibus of the defendant, and the Court held that there was sufficient evidence of negligence to justify the lower Court in submitting the case to the jury. There the plaintiff was injured by the kick of one of the horses, but it was proven that the omnibus bore evidences of other kicks and that no precaution had been taken by the use of a strap, or otherwise, against the possible consequences of a horse kicking, and no explanation was offered by the defendant. In *Benoit* v. *Troy & L. R. R. Co.*, 154 N. Y. 223, the general principles governing the liability of the owner of domestic animals, for personal injuries caused by them, are discussed, and after referring to injuries caused by kicking, biting or other vicious propensities of such animals, which are known to the owner, and how such knowledge may be brought home or imputed to him, the Court said: " In the absence of such knowledge or notice an injury caused by such animal gives no right of action, but when the vicious habit or character of the animal becomes known to the owner and he thereafter continues to keep the animal he keeps it at his peril and renders himself liable for any subsequent injury to another caused by its viciousness." That Court also held that there was error

in the Court below in submitting to the jury the fact that
the horse had run away on a previous occasion, as evidence
of a propensity to run, and added that " we think the rule
laid down by the Court on the trial extends beyond reason-
able limits the liability of owners of horses and imposes a
burden not sanctioned by any case that has come to our
notice." In *O'Brien* v. *Miller*, 60 Conn. 214, it was held
that the mere fact that a team was running away did not as
a matter of law raise a presumption of negligence on the
part of the driver. In *Unger* v. *42nd St. Railway Company*,
51 N. Y. 499, the Court said that the explanation of the
defendant's witnesses as to how the runaway happened,
which was uncontradicted, sufficiently explained the trans-
action to acquit the defendant of negligence. See also
*Holmes* v. *Mathir*, L. R. 10 Ex. 261 ; *Manzoni* v. *Douglas*,
L. R. 6 Q. B. Div. 145 ; *Cadwell* v. *Arnheim*, 152 N. Y.
184. Other cases might be cited, but the above are suffi-
cient to show the views that have generally been taken by
the Courts, and we know of no authority that would justify
the Court in permitting a jury to infer negligence simply be-
cause the defendant's horses ran away and an accident hap-
pened, without some evidence of the circumstances under
which it occurred. A horse of ordinary spirit that will not
run away under any circumstances would be a rare animal,
and to hold that simply because one did run off on one oc-
casion a jury would be justified in finding that he was
vicious, wild, or prone to run, would enable jurors to find
verdicts on mere speculation and guesses, instead of evi-
dence. We have already said enough to indicate that we
do not think that the running off when these horses were
colts, the cause of which was explained, can be fairly used
as any evidence of a disposition or proneness to run off, and
what occurred at Halstead's would likewise be no guide for
the jury in passing on that question, as the testimony of the
witnesses shows a cause for their action on that occasion.

3. The only other question we need consider is the effect
of the evidence of Mr. Kuhlman—whether that requires

the Court to submit the case to the jury. He testified that a few days after the accident he met McIlvain on the street and talked with him about the accident; that McIlvain said the horses were vicious animals, and that Kemp was afraid to drive them in from Halstead's, and wanted to leave them there and send for a hostler, but that he, McIlvain, insisted that they drive them in, and on cross-examination testified that McIlvain said "we had no business driving the horses and he (the witness) thought he said we will take the chances and drive these horses in." Both of the defendants denied that such statements were made, but in passing upon these prayers we must accept his statement in connection with his other evidence as correct. He testified that he could not say that Mr. McIllvain admitted or indicated that they had ever had any previous trouble with the horses, and it is perfectly apparent that what was said as to their being vicious was in connection with the accident, which resulted not only in injuring both of the plaintiffs, but Mr. Kemp, who was more seriously injured than they were. Considering the results, Mr. McIlvain might well have regretted that they had driven the horses into town and might even have thought that they proved to be vicious on that occasion, but if he was a competent driver and the horses had always been gentle and easily managed prior to that time, and he knew of no previous attempt by them to run away, there was so reason why he should have hesitated to drive them into the city from Halstead's. As we have seen, Mr. Kemp was suffering at the time from a pain in his side, and he had been sick for some time. His physical condition might therefore have made him timid about driving the horses after they showed some spirit at Halstead's, but if Mr. McIlvain was a competent driver, there was no reason why the appellees should be held responsible simply because they drove the horses into the city instead of leaving them at Halstead's. Even if it be conceded that the horses were somewhat unruly, or even inclined to run as they went into Halstead's, under the circumstances we

have stated, we are not prepared to say that the appellees rendered themselves liable for an accident that happened as this did, because they did not send for a hostler and let him take them into the city.    It could hardly be contended that it was the duty of the appellees to leave them at Halstead's on account of their behavior there.    It would be carrying the responsibility of the owner of horses to an unwarranted extent to hold that if horses, which had previously been gentle and easily managed, showed signs of being unruly whilst being driven, he must discontinue that drive and not be permitted to take them home.    So if we place the construction upon the language testified to by this witness that would be most favorable to the appellants, we do not think it can so far overcome the positive and uncontradicted evidence as to the disposition of the horses, the competency of Mr. McIlvain to handle them, and the circumstances attending the accident, as to justify the Court in submitting the case to the jury on these alleged admissions alone, the meaning of which is at least doubtful, and outside of them there was nothing which could properly cause the Court to hesitate to grant the instructions given.    We will therefore affirm the judgment.

> *Judgment affirmed, costs below and in this Court to be paid by the appellants.*

(Decided June 20th, 1899).