Bevis, J.
 

 The contentions of the plaintiff in error may be reduced to two:
 

 (1) That there was no evidence upon which the jury might properly base a verdict for the plaintiff.
 

 (2) That the trial court erred in refusing to charge the jury as specially requested by the defendant.
 

 Was there any evidence to go to the jury? The claim of the plaintiff below that the defendant was guilty of fault or negligence rested entirely upon two circumstances; namely, that the horse upon being ridden into the arena persistently moved his head up and down and sidewise, and that the groom, Clark, told the plaintiff, after having adjusted the bridle, that the horse was all right.
 

 Extensive questioning by counsel failed to add anything substantial to the foregoing statement concerning the movements of the horse’s head; and the attempted characterization of those movements by the plaintiff as “vicious” and “nasty” and “mean” was
 
 *548
 
 properly excluded by the trial judge, as no statement of fact appears in tbe record to give foundation to these adjectives. The plaintiff did testify that the persistent shaking of the horse’s head made her feel “uncomfortable,” and it was this apparently which led her to make the statement to the groom that she thought she should dismount. Her feeling in this respect, however, was apparently not very strong, for she continued her ride after a trifling adjustment of the bridle and the bare statement by the groom that he thought the horse was all right.
 

 Mrs. Miller reiterated in her testimony that she was not an experienced horsewoman. She was, however, not wholly inexperienced. She had ridden horses from time to time since childhood. She had frequently patronized this and other riding establishments in Cleveland. She fixed the number of times she had been at Troop A at from fifteen to twenty. She had ridden in the west on a ranch. She said she knew how to “post,” and that “posting” was different from the western style of riding. She knew the difference between an English saddle and a western saddle. She knew what a martingale was, and, in general, she showed considerable familiarity with horses and the technique of riding.
 

 The record is totally silent as to this horse’s previous behavior. There is no evidence that he had ever moved his head in this fashion before; that he had ever run away; that he had ever fallen; or that his health and physical condition were not good. The arena was covered with tan bark, which was wet, but there is no evidence that it was not in proper condition for riding.
 

 There was no testimony of any kind that the movements of the horse’s head, as described, were an indication that the horse was ill, or improperly saddled or bridled, or in any other way unfit for service.
 

 Do the facts thus disclosed present a case for the
 
 *549
 
 consideration of the jury? Authority in Ohio upon the precise point in question is meager. It is hornbook law that negligence is not presumed in the absence of proof from which negligence may be inferred. In the absence of such proof, a party is entitled to the benefit of the presumption that he was free from negligence.
 
 Martin, Jr.,
 
 v.
 
 Heintz,
 
 126 Ohio St., 227, 184 N. E., 852.
 

 A leading case, made the subject of an extensive note in 12 A. L. R., 774, is
 
 Cooper
 
 v.
 
 Layson Brothers,
 
 14 Ga. App., 134, 80 S. E., 666. In that case it was laid down that:
 

 “Livery-stable keepers who let animals for hire are bound only to exercise ordinary care and diligence in providing an animal suitable for the purpose for which it is hired.”
 

 In
 
 Copeland v. Draper,
 
 157 Mass., 558, 32 N. E., 944, 19 L. R. A., 283, 34 Am. St. Rep., 314, the opinion written by former Justice Holmes of the Supreme Court of the United States, while he was a member of the Massachusetts court, it is said:
 

 “If it should be sought to charge the defendant for the horse as for a dangerous animal, the liability for a horse on that ground, apart from bailment, is confined to cases where the owner has notice of the dangerous tendency.”
 

 There is no presumption that a horse is vicious. In
 
 Phillips
 
 v.
 
 Dewald,
 
 79 Ga., 732, 7 S. E., 151, 11 Am. St. Rep., 458, it is said in the opinion:
 

 “A vicious animal is any individual of a vicious species, or a vicious individual of a harmless species. This horse was neither * * *.”
 

 In
 
 Twigy
 
 v.
 
 Ryland,
 
 62 Md., 380, 386, 50 Am. Rep., 226, the court said:
 

 “The notice which will charge the owner or keeper with liability for the vicious conduct of the animal must be notice that it was inclined to do the particular mischief that has been done.”
 

 
 *550
 
 In
 
 Creamer
 
 v. McIlvain, 89 Md., 343, 43 A., 935, 45 L. R. A., 531, 73 Am. St. Rep., 186, the court said:
 

 “A horse of ordinary spirit that will not run away under any circumstances would be a rare animal, and to hold that simply because one did run off on one occasion a jury would be justified in finding that he was vicious, wild, or prone to run, would enable jurors to find verdicts on mere speculation and guesses, instead of evidence.”
 

 Many other cases might be cited to the same general effect, but the foregoing are, we believe, sufficient indication of the general trend of the law.
 

 Tested by the criteria thus established, was there evidence upon which liability might be predicated? We think not. There was no evidence that the defendant had knowledge of any trait or propensity in the horse which might lead to the injury complained of; neither was there evidence of a causal connection between the tossing of the horse’s head and his beginning to run, or his falling down. To assert such causal connection is to indulge in conjecture, a conjecture no more probable than that the horse’s running and falling was caused by something the plaintiff did herself.
 

 Considerable reliance is placed upon the circumstance that the groom, after having had his attention called to' the tossing of the horse’s head, told Mrs. Miller that he was all right or “perfectly safe,” as one witness expressed it. From all that appears in the record, the groom was utterly without previous knowledge of anything that would render “'So and So” unsafe. The fact that the horse had thrown his head about was just as much within the knowledge of the plaintiff as within the knowledge of the groom. One who engages in an enterprise for amusement or exercise or sport, such as horseback riding, must be taken to have incurred the normal risks.
 

 The defendant in error devotes considerable space in her brief to the point that “assumption of risk is an
 
 *551
 
 affirmative defense which it is necessary to plead specially and to support by testimony, ’ ’
 
 Jones
 
 v.
 
 Erie Rd. Co.,
 
 106 Ohio St., 408, 140 N. E., 366; and that the doctrine of assumption of risk applies only to cases between employer and employee,
 
 Hauer, Admr.,
 
 v.
 
 French Brothers-Bauer Co.,
 
 43 Ohio App., 333, 183 N. E., 186, 36 O. L. R., 51, 11 Ohio Law Abs., 217.
 

 “While, perhaps, the term “assumption of risk” technically connotes a consequence of contract, courts generally, including the courts of Ohio, have sometimes used this term interchangeably with phrases such as “taking the risk” or “incurring the risk.” 45 Corpus Juris, 1043, 1044. The thought behind these phrases as thus used has frequently been indicated in the law by the expression
 
 “volenti non fit injuria/’
 
 Pollock, Law of Torts (12th Ed.), 159; “Voluntary Assumption of Risk,” Francis H. Bohlen, 20 Harvard Law Review, 91.
 

 In
 
 City of Dayton
 
 v.
 
 Taylor’s Administrator,
 
 62 Ohio St., 11, 56 N. E., 480, 43 W. L. B., 209, where the plaintiff sued the city for injuries received by him when he departed from the sidewalk, Judge Davis said:
 

 “ * * * In departing from the usual and safe way which the municipality had provided for him, he assumed all of the risks which lay in the path which he chose for himself.”
 

 This doctrine is peculiarly applicable to cases such as the one under consideration. In
 
 Benjamin
 
 v.
 
 Nernberg,
 
 102 Pa. Super. Ct., 471, 157 A., 10, the superior court of Pennsylvania said of one who was struck by a ball on a golf course:
 

 “It must be admitted that plaintiff assumed all the ordinary dangers incident to the game.”
 

 In
 
 Murphy
 
 v.
 
 Steeplechase Amusement Co., Inc.,
 
 250 N. Y., 479, 166 N. E., 173, the New York Court of Appeals held that one taking part in trying to keep footing on a belt of an amusement park device accepts dangers inhering therein, so far as they are obvious and
 
 *552
 
 necessary. Judge Cardozo, then a member of that court, said in the opinion:
 

 “A fall was foreseen as one of the risks of the adventure. * * *
 
 Volenti non fit injuria.
 
 * * * The plaintiff was not seeking a retreat for meditation. * * * The timorous may stay at home. * * * Nothing happened to the plaintiff except what common experience tells us may happen at any time as the consequence of a sudden fall. Many a skater or a horseman can rehearse a tale of equal woe.”
 

 In our opinion, the plaintiff took upon herself the ordinary risks of horseback riding. The evidence fails to disclose that the defendant or the defendant’s groom had previous knowledge of anything about the horse “So and So” which would render the risk she took greater than ordinary.
 

 We are therefore of the opinion that there was not sufficient evidence to carry the case to the jury.
 

 What has already been said disposes of the case. In our opinion, in view of the evidence, the defendant was entitled to have a proper instruction given to the jury as to the risk incurred by the plaintiff when she undertook horseback riding.
 

 For the foregoing reasons, in our opinion, the judgment of the Court of Appeals should be reversed, and final judgment entered for plaintiff in error.
 

 Judgment reversed and final judgment for plaintiff in error.
 

 Weygandt, C. J., Stephenson, Jones, Matthias and Zimmerman, JJ., concur.
 

 Allen, J., not participating.