DECISION AND JOURNAL ENTRY
{¶ 1} Appellant, Lisa Rutkai, appeals the judgment of the Summit County Court of Common Pleas, which granted summary judgment in favor of Appellee, Dale Freeland. This Court affirms.
 I. {¶ 2} On May 4, 2007, Rutkai filed a complaint sounding in negligence against Freeland, her uncle. She alleged that she was an invitee on Freeland's property on May 5, 2005, when she was injured when one of Freeland's horses she was riding threw her and fell on her. She alleged that Freeland knew that the horse, Moon, could only be safely controlled by the use of a hackamore bridle, rather than a bit bridle, and that he failed to warn her of such. Rutkai alleged that Freeland's negligence was the direct and proximate cause of the injuries she sustained in the riding accident. She further alleged claims of loss of consortium on behalf of her *Page 2 
two children, Terrance and Meredith. Freeland timely answered, denying the allegations and raising several affirmative defenses.
 {¶ 3} A pretrial was held on August 23, 2007. On August 27, 2007, the trial court issued a pretrial order, ordering the plaintiff (Rutkai) to identify trial experts and submit expert reports on or before December 3, 2007. On December 3, 2007, Rutkai filed her "Complete Witness List" identifying twelve potential witnesses, but not identifying any of them as experts. In addition, she did not submit any purported expert reports by that date.
 {¶ 4} On February 5, 2008, Freeland filed a motion for summary judgment. He appended his responses to Rutkai's interrogatories and a transcript of Rutkai's deposition testimony. Rutkai filed a brief in opposition; transcripts of the deposition testimony of Freeland and another family member, James Freeland; and other exhibits. On March 11, 2008, Freeland filed a reply in support of his motion for summary judgment and a motion to strike the exhibits submitted with Rutkai's brief in opposition. On April 22, 2008, Rutkai filed a discovery motion, requesting that she be allowed to obtain an expert examination of the horse Moon and submit the expert report as evidence. On May 15, 2008, the trial court issued an order granting Freeland's motion to strike Rutkai's exhibits submitted with her opposition to the motion for summary judgment, denying Rutkai's motion to conduct and submit an expert report regarding Moon, and granting Freeland's motion for summary judgment.
 {¶ 5} Rutkai timely appealed, raising ten assignments of error for review. This Court rearranges and consolidates some assignments of error for ease of discussion.
 II. ASSIGNMENT OF ERROR II "THE TRIAL COURT ERRED WHEN THEY (sic) GRANTED THE DEFENDANT'S MOTION TO STRIKE THE PLAINTIFF'S EXHIBITS." *Page 3 
 {¶ 6} Rutkai argues that the trial court erred by striking her exhibits submitted in support of her brief in opposition to Freeland's motion for summary judgment. This Court disagrees.
 {¶ 7} Civ. R. 56(C) sets forth an exclusive list of the evidentiary materials a court may consider when determining how to rule on a motion for summary judgment. Specifically, the court may consider "the pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence, and written stipulations of fact[.]" Civ. R. 56(C). "However, the trial court may consider a type of document not expressly mentioned in Civ. R. 56(C) if such document is `accompanied by a personal certification that [it is] genuine or [is] incorporated by reference in a properly framed affidavit pursuant to Civ. R. 56(E).'" Countrywide Home Loans, Inc. v. Rodriguez, 9th Dist. Nos. 03CA008345, 03CA008417, 2004-Ohio-4723, at ¶ 9, quoting Modon v.Cleveland (Dec. 22, 1999), 9th Dist. No. 2945-M.
 {¶ 8} The trial court struck Rutkai's Exhibits A through G. She only argues error, however, in regard to Exhibits B, C and D, to wit: three photographs. Rutkai argues that Freeland authenticated the photographs during his deposition. First, this Court notes that only Exhibits A, F and G are attached to Freeland's deposition. Three photographs with stickers stating "Plaintiff's Deposition Exhibit B," "Plaintiff's Deposition Exhibit C," and "Plaintiff's Deposition Exhibit D" are stapled to a packet containing Rutkai's medical records which are not labeled as an exhibit. The medical records are further bundled with other miscellaneous unauthenticated documents. Within this context, it is not clear whether the three photographs constitute the evidentiary materials Rutkai seeks to have considered in regard to her opposition to the motion for summary judgment. *Page 4 
 {¶ 9} Even assuming that the three photographs are those listed in the Index to Freeland's deposition, Freeland identified Exhibit B as "Moon with James" but he was unable to identify the context of the picture. Freeland could not identify with certainty the subject of Exhibit C, and he never addressed Exhibit D.[1] Under the circumstances, the deponent did not authenticate Exhibits B, C or D. Accordingly, the trial court did not err by striking the exhibits. Rutkai's second assignment of error is overruled.
 ASSIGNMENT OF ERROR IV "THE TRIAL COURT ERRED IN THE ORDER, WHEN THEY (sic) CLAIMED THAT THE PLAINTIFF REQUESTED A MOTION FOR LEAVE TO CONDUCT AND SUBMIT AN EXPERT REPORT, AND THAT SHE DID NOT COMPLY WITH THE DEADLINE STATED ON THE ORDER DATED AUGUST 27, 2007."
 {¶ 10} Rutkai argues that the trial court erred in denying her discovery motion, requesting leave to obtain a physical examination of the horse, Moon. This Court disagrees.
 {¶ 11} Rutkai claims that "dismissal is a harsh remedy" to impose for failure to comply with a discovery order. The trial court, however, did not dismiss Rutkai's complaint, or otherwise sanction her, for failing to comply with discovery orders. Rather, the trial court merely denied her motion to obtain a physical examination of Moon.
 {¶ 12} This Court has held:
 "[T]he trial court enjoys substantial discretion in the regulation of discovery proceedings. Therefore, absent an abuse of discretion, an appellate court will not reverse the trial court's ruling on such a matter. Despite this broad discretion held by trial courts in discovery matters, trial courts must consider the interests of parties seeking discovery and the interests of parties and nonparties resisting *Page 5 
discovery." (Internal citations and quotations omitted.) McPherson v. Goodyear Tire Rubber Co., 9th Dist. No. 21499, 2003-Ohio-7190, at ¶ 14.
 {¶ 13} Rutkai argues that she identified "Harry Brown" on her witness list and interrogatories. Answers to interrogatories posed to her are not in the record. Her August 23, 2007 pre-trial statement fails to identify any expert witnesses. Her December 3, 2007 witness list identifies "Harry Brown" but does not identify him in any way as an expert. Rutkai's April 22, 2008 discovery motion does not name any expert who would conduct the physical examination of Moon. Rather, she requests that the court "allow her to have a professional/expert veterinary or state/county examiner" examine the horse.
 {¶ 14} On August 27, 2007, the trial court ordered that Rutkai must identify experts and submit expert reports on or before December 3, 2007. Freeland would then have until January 14, 2008, to do the same. Rutkai filed her motion for leave to obtain the horse's physical examination on April 22, 2008, more than two months after the deadline for completion of all discovery on February 1, 2008. By the time she filed her discovery motion, the motion for summary judgment had been fully briefed by both sides. The trial court found Rutkai's discovery motion untimely. Under the circumstances, this Court cannot say that the trial court abused its discretion by denying Rutkai's discovery motion. Rutkai's fourth assignment of error is overruled.
 ASSIGNMENT OF ERROR I "THE COURT ERRED AND ABUSED ITS DISCRETION IN GRANTING SUMMARY JUDGMENT TO THE DEFENDANT, (APPELLEE)."
 ASSIGNMENT OF ERROR VI "THE TRIAL COURT ERRED[] IN SUGGESTING THAT THE DEFENDANT AND PLAINTIFF WERE ON `EQUAL FOOTING' AS STATED ON PAGE 6 OF THE ORDER." *Page 6 
 ASSIGNMENT OF ERROR VII "THE TRIAL COURT ERRED IN STATING, ON PAGE 7 OF THE ORDER, `THAT THE DEFENDANT DIDN'T HAVE SUPERIOR KNOWLEDGE OR CONTROL OF THE TACK IN QUESTION.' FURTHERMORE, THE ORDER[] WENT ON TO SAY, THE `DEFENDANT NEVER USED A HACKAMORE ON `MOON''". (sic)
 ASSIGNMENT OF ERROR VIII "THE TRIAL COURT ERRED IN STATING, ON PAGE 7 OF THE ORDER, `THAT THERE IS NO EVIDENCE TO SUPPORT PLAINTIFF'S ASSERTION THAT THE USE OF A HACKAMORE IS A SAFER METHOD FOR RIDING AND CONTROLLING `MOON' RATHER THAN THE USE OF A REGULAR BIT'." (sic)
 ASSIGNMENT OF ERROR IX "THE TRIAL COURT ERRED[] IN CLASSIFYING THE PLAINTIFF AS A `HYBRID', WHICH IS BETWEEN AN INVITEE AND A SOCIAL GUEST, STATED ON PAGE 4 OF THE ORDER." (sic)
 ASSIGNMENT OF ERROR X "THE TRIAL COURT ERRED IN JUDGMENT, NOT FINDING THAT THE PLAINTIFF HAS DEMONSTRATED THE FOLLOWING ELEMENTS, TO BE AWARDED, SUMMARY JUDGMENT ON BEHALF OF HER NEGLIGENCE CASE AGAINST THE DEFENDANT." (sic)
 {¶ 15} Rutkai argues that the trial court erred by granting summary judgment in favor of Freeland as against her. This Court disagrees.
 {¶ 16} This Court reviews an award of summary judgment de novo.Grafton v. Ohio Edison Co. (1996), 77 Ohio St.3d 102, 105. This Court applies the same standard as the trial court, viewing the facts in the case in the light most favorable to the non-moving party and resolving any doubt in favor of the non-moving party. Viock v. Stowe-WoodwardCo. (1983), 13 Ohio App.3d 7, 12. *Page 7 
 {¶ 17} Pursuant to Civ. R. 56(C), summary judgment is proper if:
 "(1) No genuine issue as to any material fact remains to be litigated; (2) the moving party is entitled to judgment as a matter of law; and (3) it appears from the evidence that reasonable minds can come to but one conclusion, and viewing such evidence most strongly in favor of the party against whom the motion for summary judgment is made, that conclusion is adverse to that party." Temple v. Wean United, Inc. (1977), 50 Ohio St.2d 317, 327.
 {¶ 18} To prevail on a motion for summary judgment, the party moving for summary judgment must be able to point to evidentiary materials that show that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Dresher v.Burt (1996), 75 Ohio St.3d 280, 293. Once a moving party satisfies its burden of supporting its motion for summary judgment with sufficient and acceptable evidence pursuant to Civ. R. 56(C), Civ. R. 56(E) provides that the non-moving party may not rest upon the mere allegations or denials of the moving party's pleadings. Rather, the non-moving party has a reciprocal burden of responding by setting forth specific facts, demonstrating that a "genuine triable issue" exists to be litigated for trial. State ex rel. Zimmerman v. Tompkins (1996), 75 Ohio St.3d 447,449.
 {¶ 19} To prevail on a claim of negligence, Rutkai must establish the existence of a duty, a breach of that duty, and an injury proximately resulting from the breach of duty. Menifee v. Ohio Welding Prods.,Inc. (1984), 15 Ohio St.3d 75, 77. Whether or not a duty exists is a question of law. Williams v. Garcias (Feb. 7, 2001), 9th Dist. No. 20053. The trial court found that no duty existed under the theory of premises liability, the theory of liability alleged in Rutkai's complaint.
 {¶ 20} The Ohio Supreme Court has stated that "[i]t is axiomatic that, under the common law of premises liability, the status of the person who enters upon the land of another (i.e., trespasser, licensee, or invitee) defines the scope of the legal duty that the responsible party owes *Page 8 
the entrant." Shump v. First Continental-Robinwood Assoc. (1994),71 Ohio St.3d 414, 417. After a lengthy discussion of the various categories of persons who enter upon the land of another, the Ohio Supreme Court noted that some legal authorities have recognized a sub-category of licensees, specifically social guests. Scheibel v.Lipton (1951), 156 Ohio St. 308. The Scheibel court ultimately rejected the inclusion of social guests as a sub-category of licensees and recognized "social guest" as a distinct status of person who enters upon the land of another to whom a host owes a distinct duty. Id. at 328. The trial court analyzed Freeland's duty from the perspective of Rutkai's status as both an invitee and a social guest and found no duty by Freeland under either circumstance.
 {¶ 21} In her complaint, Rutkai alleged that she was an invitee on Freeland's property at the time of the accident, although she asserted no allegations as to why she should be accorded that status. "Invitees are persons who rightfully come upon the premises of another by invitation, express or implied, for some purpose which is beneficial to the owner." Gladon v. Greater Cleveland Regional Transit Auth. (1996),75 Ohio St.3d 312, 315, citing Light v. Ohio Univ. (1986),28 Ohio St.3d 66, 68; Scheibel, 156 Ohio St. at paragraph one of the syllabus.Troop A Riding Academy v. Miller (1934), 127 Ohio St. 545, the seminal Ohio Supreme Court case cited by the trial court, holds the following:
 "1. One who rides a horse, which he has hired for that purpose, takes the ordinary risks incident to such pursuit.
 "2. In order to recover for injuries received when a horse hired for riding runs and falls, one who sues in tort must show knowledge, on the part of the [ow]ner or his agents, of some trait, condition, or propensity from which a probability of the horse's running away or falling might reasonably be inferred.
 "3. When there is no evidence of any known trait, condition, or propensity of the horse, which would subject the rider to greater risks than ordinarily attach to horseback riding, it is error for the trial judge to submit such case to the jury." Id. at paragraphs one to three of the syllabus. *Page 9 
 {¶ 22} In this case, Dale Freeland testified during his deposition that Rutkai took care of all the horses on a voluntary basis. He testified that he gave her permission to ride because she was an experienced rider and she was also training her son to ride. Rutkai's cousin James Freeland testified during his deposition that there was an understanding in the family that anyone who rides one of Dale Freeland's horses on his property is responsible for caring for that particular horse. James further testified, however, that if no one is riding a particular horse, then Dale, his wife and whoever else was living on the property took care of the horses. In the absence of any other evidence, this Court would be compelled, in construing the evidence in the light most favorable to Rutkai as the non-moving party, to consider her to be an invitee under the circumstances because a question of fact appears to exist as to whether Rutkai could ride only because she was caring for the horses.
 {¶ 23} However, Rutkai affirmatively states in her brief in opposition to the motion for summary judgment, "Although plaintiffs own testimony establishes that plaintiff was not caring for the defendant, Dale Freeland's horses in exchange for the privilege of riding them, she does admit that she did provide care that his equestrians (sic) needed and was owed to them." Although she testified that she helped Freeland care for the horses in general due to his impaired physical condition, the evidence shows that she was not injured while caring for Moon. Rather, she testified that she was riding Moon at the time of the accident as she was training her son to ride another horse. There is no evidence that Freeland derived any benefit from Rutkai's training her son to ride horses. In fact, it was Rutkai and her son who derived a benefit from being allowed to ride and train with Freeland's horses, as family members had done for generations. Accordingly, there is no evidence that Rutkai was an invitee on Freeland's property at the time of the accident. *Page 10 
 {¶ 24} This case is more analogous to the situation in Karlovich v.Nicholson (Sept. 30, 1999), 11th Dist. No. 98-L-097, in which Ms. Karlovich was injured while riding one of the defendants' horses. Karlovich conceded that she helped the defendants care for their horses, but not in exchange for riding them. Under those circumstances, Karlovich was determined to be a social guest. The evidence in the instant case demonstrates that Rutkai was a social guest at the time of her injury.
 {¶ 25} The Ohio Supreme Court has held:
 "2. A host is not an insurer of the safety of a guest while upon the premises of the host and there is no implied warranty on the part of a host that the premises to which a guest is invited by him are in safe condition.
 "3. A host who invites a social guest to his premises owes the guest the duty (1) to exercise ordinary care not to cause injury to his guest by any act of the host or by any activities carried on by the host while the guest is on the premises, and (2) to warn the guest of any condition of the premises which is known to the host and which one of ordinary prudence and foresight in the position of the host should reasonably consider dangerous, if the host has reason to believe that the guest does not know and will not discover such dangerous condition." Scheibel, 156 Ohio St. at paragraphs two and three of the syllabus.
A host owes a duty of care to his social guest short of that owed to an invitee. Id. at 329.
 {¶ 26} Rutkai testified that Freeland is not always home when she goes to his property to ride or train her children to ride. She testified that she typically honks her car horn as she enters the property to let Freeland know she is there. On the day she was injured, she honked her horn and saw Freeland's car on the premises but she did not see him. He testified that he was not on the premises at the time of her injury. Rutkai testified that she got Moon ready to ride herself that day, without Freeland's help, using the tack, or equipment, she had used on previous occasions when she rode Moon. Accordingly, there is no evidence that Freeland failed to use ordinary care by engaging in any act or activity to cause Rutkai's injuries. *Page 11 
 {¶ 27} Rutkai alleged that Freeland was negligent for failing to provide her with a hackamore to control Moon, instead of a bit bridle, because he knew Moon had been trained on a hackamore and that the horse had a sensitive mouth. A hackamore is a headpiece which allows a rider to control a horse without putting pressure on a horse's mouth, while a bit is inserted into the horse's mouth and relies on pressure to the mouth to control the horse.
 {¶ 28} Freeland testified that Moon was originally trained with a hackamore but that the trainer who worked with Moon and one of Freeland's relatives switched Moon to a bit mouthpiece in 1995. He testified that he switched Moon to a bit at the trainer's suggestion because he (Freeland) shows all his horses in trail competitions and horses cannot be shown in trail class with a hackamore. There is nothing in the record to indicate that Moon became skittish, or otherwise difficult to control, upon being switched to a bit. In addition, there is nothing in the record to indicate that anyone else suffered injuries as a result of riding Moon with a bit between 1995 and Rutkai's accident on May 5, 2005.
 {¶ 29} While Freeland conceded that Moon has a sensitive mouth, he testified that Moon would throw his head up if someone were to use a hackamore and pull back on the horse too strongly. He denied that a hackamore is better for a horse with a sensitive mouth. In fact, he testified that a bit was better because it allows the rider more control. He testified that, more importantly, riders must have "soft" rather than "heavy" hands to ride Moon, and should use their voices and legs to control the horse.
 {¶ 30} Freeland testified that Moon is a very gentle horse, but that he gets excited "if he's running a lot." He testified that a relative had been riding Moon in 2002, but that the horse had not been ridden much in the year before Rutkai's accident. He testified that he told Rutkai not to ride Moon because the horse had not been ridden in a while and was therefore "spirited" or *Page 12 
full of energy, and because she was too heavy handed for Moon. He testified that he believed his father, Elvis Freeland, and his nephew James also told Rutkai not to ride Moon.
 {¶ 31} James Freeland testified that it was common knowledge that Moon was spirited and that Rutkai was aware of this. He testified that Rutkai was an experienced rider who would know what to expect from such a horse. In addition, James testified that Dale Freeland has told others not to ride Moon and that he has heard others say that Dale had told Rutkai not to ride Moon.
 {¶ 32} James Freeland testified that Dale Freeland supplies the bridle for each horse, specifically the bit that each horse is used to working with. He testified that, while it was possible to use a different type of tack on a horse, the horse would act differently. He asserted that changing a horse's tack could put the horse and rider in danger. James testified that Moon's original owners "broke [him] to a Hackamore" but that they began changing Moon to a bit before they sold him to Freeland. He testified that family members who rode Moon used a bit. After Rutkai's accident, James testified that he rode Moon several times using a hackamore because he believes that Moon works better with a hackamore. He testified that others disagree with that. James conceded, however, that he understood that there were risks involved with switching Moon from a bit back to a hackamore, but he assumed the responsibility for those risks. James testified that he found the hackamore in the barn in a tack box after looking for 25 to 30 minutes. James testified that he was hurt by Moon the first time he rode the horse with a hackamore after Rutkai's accident.
 {¶ 33} Dale Freeland testified that he allowed James to use a hackamore on Moon after Rutkai's accident but that it was not going to be permanent because he could only show Moon in trail class using a bit. He testified that James found the hackamore in a tack box and that the *Page 13 
hackamore had not been used by anyone for years. He testified that it had been used on another horse named "Ticket." Freeland testified that, when James was riding Moon with a hackamore after Rutkai's accident, James was quickly hurt as Moon behaved in a skittish manner. When questioned about what would happen if a rider changes a horse's tack abruptly, Freeland testified:
 "Well, it's like changing cars, if you're not familiar with it you shouldn't be driving it, you should familiarize yourself. Same with a horse, you change bits, bridles, they're going to act different because they're used to one thing. A horse is taught by repetition."
Freeland testified that Rutkai could have prevented her injuries by not riding a horse she knew had not been ridden for a while and who would necessarily be spirited. He testified that, while Rutkai had ridden his horses before her accident, she had not ridden Moon.
 {¶ 34} Rutkai testified that, before her accident, she and her children rode Freeland's horses at least three times a week. She testified that they "never saddled" Moon, that "he was the one horse that did not get rode." In fact, she testified that she herself "[v]ery seldom" rode because she was training her son to ride. She testified that, when she did ride, she rode "Rocket," the horse her son was training to ride.
 {¶ 35} Rutkai then testified that she in fact rode Moon four or five times before her accident and that Freeland was with her every time. She testified that they wanted to see "how [Moon] was reacting because no one really did anything with him." Rutkai testified that Moon "is a really good horse [but] [h]e could act funny." She clarified that Moon would "kick the stalls" when she and her children took the horse Rocket out for a ride because Moon wanted to go out too. She testified that Moon was "not a crazy horse * * *. He's a horse that even my daughter could get him out and let him go[.]" She testified that her daughter was nine at the time of her deposition on November 14, 2007. *Page 14 
 {¶ 36} Rutkai testified that every time she rode Moon, Dale Freeland helped her saddle him. She testified that Dale told her to use the "snaffle" or straight bit and that he supplied Moon's full tack. She testified that she provided new tack for the horse Rocket, except for the bit because "the bit stays the same[.]"
 {¶ 37} Rutkai testified that, on the day of the accident, Freeland did not come to the barn to help her prepare Moon for riding; rather, she alone put all the tack on Moon. She testified that she used the same tack that she had always used on Moon. She testified that she began to ride Moon and that he "reared" in less than five minutes, throwing her and falling on top of her.
 {¶ 38} Rutkai testified that she generally rode the horse Rocket. She testified that she was aware that Rocket had a better temperament than Moon, that Rocket was better trained, and that Rocket was easier to handle and control than Moon.
 {¶ 39} Rutkai testified that it was only after her accident that she learned that Moon had been trained on a hackamore. She testified that she had cleaned the barns for a year before her accident and she never saw a hackamore there. She admitted that she has never known Freeland to own a horse who used a hackamore. She further admitted that, whenever she saw Freeland ride Moon, he used a bit, not a hackamore. She testified, however, that Freeland is an experienced rider who knows how to control horses with his legs and body motion. Rutkai also testified:
 "Well, first of all, back up to the explanation of you can't change tack on a horse, if you ride with a hackamore, your ride with a hackamore. That's a very — really serious thing to do is change anything."
 {¶ 40} Rutkai testified that, after her accident, she "was told by several different people that [Moon] was trained with a hackamore, that he should have never been rode that day that I rode him with a bit[.]" She did not name Freeland as one of those people. Finally, Rutkai *Page 15 
testified that she had no independent knowledge that Moon was originally trained on a hackamore, although she assumed that he was trained on a regular bit because that is the only mouthpiece she had ever seen him use.
 {¶ 41} Freeland has met his initial burden in regard to the first prong of his duty as enunciated in Scheibel, 156 Ohio St. at paragraph three of the syllabus, by presenting evidence to show that he exercised ordinary care not to cause Rutkai injury. There was evidence that he told her not to ride Moon because he had not been ridden for some time. There was also evidence that he provided the tack to which Moon was accustomed. In addition, Freeland met his initial burden in regard to the second prong of his duty to a social guest under Scheibel. There was evidence that Freeland warned Rutkai regarding the only situation that he believed might be dangerous. That is, Freeland presented evidence that he told Rutkai not to ride Moon because he had not been ridden in a while and might be too spirited.
 {¶ 42} Rutkai failed to meet her reciprocal burden underTompkins, supra, to show that genuine issues of material fact still remained. Rutkai's primary allegation of negligence was that Freeland "fail[ed] to inform [her] that Moon needed a hackamore rather than a bit to properly and safely control the horse to avoid serious injury or death." In fact, in her opposition to the motion for summary judgment, she asserted, "This plaintiff, Lisa Rutkai, filed this personal injury; negligence case, against the defendant for not providing her the proper tack to ride his equestrian `Moon'." (sic) Even though Freeland knew that Moon was trained on a hackamore by his original owners, there is evidence that Freeland switched Moon over to a bit in 1995 at the suggestion of a trainer so that Freeland could enter Moon into trail competitions. The evidence establishes that Moon used only a bit as of 1995 until James Freeland rode Moon after Rutkai's accident using a hackamore found in the barn and buried under other items in an old tack box *Page 16 
which had not been used in years. The evidence shows that, although Moon had not been ridden for a while, he was ridden over the years with a bit without any evidence of any other incidents.
 {¶ 43} Rutkai failed to present any evidence to show that Freeland had any reason to know that Moon would injure a rider who used a bit instead of a hackamore. In addition, Rutkai testified that she took care of all the horses on Freeland's property and that she had ridden Moon four or five times prior to her accident, using a bit. She never claimed to have had a prior injury while riding Moon with a bit. Accordingly, the only evidence establishes that, if it was dangerous to ride Moon with a bit, Rutkai, having ridden him four to five times prior to her accident using a bit, would have been in a position to discover such dangerous condition.
 {¶ 44} The crux of Rutkai's allegations of negligence center around Freeland's providing a bit in lieu of a hackamore. Specifically, in "Count I-Negligence against Dale Freeland," she alleged solely that "Defendant breached that duty in failing to inform Plaintiff, Lisa L. Rutkai, that Moon needed a hackamore rather than a bit to properly and safely control the horse to avoid serious injury or death." In "Count II-Premises Liability," her theory of negligence, Rutkai also alleged that "Defendant breached its duty of care by failing to, among other things, inform and/or warn Plaintiff of any known dangers associated with his horses on the property, including, but not necessarily limited to the fact that his horse, Moon, needed a hackamore rather than simply a bit to be properly and safely controlled to avoid serious injury or death." To the extent that Rutkai's complaint alleges that Freeland breached his duty of care in other ways, Freeland met his initial burden under Dresher to counter any more general allegations. Freeland's evidence established no propensity by Moon for violence or dangerous behavior. At most, Freeland and his nephew James testified that Moon was "spirited" but not that he was dangerously or atypically so. *Page 17 
 {¶ 45} On the other hand, Rutkai failed to meet her reciprocal burden under Tompkins in this regard. Rutkai testified that she personally witnessed Moon "kick the stalls" when he wanted to run with another horse being saddled. She further testified that she forbade her son from riding Moon because she knew Moon was not as well trained, "mellow," or easy to control as the larger horse Rocket. She further testified that Moon's temperament was not as good as Rocket's and that Moon did not listen to commands as well as Rocket did. Accordingly, Rutkai presented no evidence to show that Freeland possessed superior knowledge regarding Moon's disposition and propensities. Therefore, Rutkai failed to present any evidence that Freeland breached his duty of care to Rutkai as his social guest.
 {¶ 46} Based on this Court's thorough review of the evidence, no genuine issue of material fact exists in regard to Rutkai's claim of negligence. Accordingly, the trial court did not err by granting summary judgment in favor of Freeland as against Rutkai. Rutkai's first, sixth, seventh, eighth, ninth and tenth assignments of error are overruled.
 ASSIGNMENT OF ERROR V "THE TRIAL COURT ERRED, UNDER OHIO'S EQUINE ACTIVITY LIABILITY ACT, []R.C.[] 2305.321(B)(2)(B), THAT THE DEFENDANT IS NOT IMMUNE TO LIABILITY."
 {¶ 47} Rutkai argues that the trial court erred by granting summary judgment in favor of Freeland because Freeland is not immune from liability under the Ohio Equine Activities Liability Act, R.C. 2305.321. This Court declines to consider this argument.
 {¶ 48} Freeland's argument in his motion for summary judgment that he was immune from liability pursuant to R.C. 2305.321 was only one of several alternative arguments raised in support of his motion. The trial court declined to analyze Freeland's alleged immunity under the act, having found substantively that Freeland was entitled to summary judgment on the basis of a *Page 18 
premises liability analysis. Because of this Court's resolution of Rutkai's first, sixth, seventh, eighth, ninth and tenth assignments of error, any issue of Freeland's immunity pursuant to R.C. 2305.321 is moot and we decline to address her fifth assignment of error. See App. R. 12(A)(1)(c).
 ASSIGNMENT OF ERROR III "THE TRIAL COURT ERRED WHEN THEY (sic) DIDN'T ALLOW [RUTKAI] TO SUBMIT ALL THE EVIDENCE ON MAY 16, 2008, AT THE TRIAL CONFERENCE."
 {¶ 49} Rutkai argues that the trial court erred by refusing to allow her to submit evidence at a trial management conference scheduled for May 16, 2008. This Court disagrees.
 {¶ 50} The trial court scheduled the final trial management conference as a result of the initial pretrial on August 23, 2007, at which time the trial court issued all case management orders, including discovery and dispositive motion deadlines, as well as a trial date. The trial court issued its ruling on Freeland's motion for summary judgment on May 15, 2008, dismissing Rutkai's complaint and, thereby, negating the need for further pretrial conferences or trial. Accordingly, the trial court did not err by refusing to allow Rutkai to submit further evidence in support of her claims which had been dismissed. Rutkai's third assignment of error is overruled.
 III. {¶ 51} Rutkai's first, second, third, fourth, sixth, seventh, eighth, ninth and tenth assignments of error are overruled. This Court declines to address the fifth assignment of error as it has been rendered moot. The judgment of the Summit County Court of Common Pleas is affirmed.
 Judgment affirmed. *Page 19 
The Court finds that there were reasonable grounds for this appeal.
We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App. R. 27.
Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App. R. 22(E). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App. R. 30.
Costs taxed to Appellant.
WHITMORE, J. DICKINSON, J. CONCUR
[1] After questioning Freeland regarding Exhibit C, Rutkai stated, "This is James again." The comment may have been in regard to Exhibit D, but that exhibit was never addressed as such. Furthermore, Rutkai was not under oath at Freeland's deposition. Rather, she was acting as her own counsel and deposing Freeland. Freeland, the only person under oath, made no reference to Exhibit D.