SMITH, Appellant, vs. PABST, Respondent.    [Two cases.]
*November 8, 1939—February 13, 1940.*

For the appellants there were briefs by *Bagley, Spohn, Ross & Stevens* of Madison, and *Shannon & Cronin* of Oconomowoc, and oral argument by *William H. Spohn* and *Gilbert McDonald* of Madison.

For the respondent there was a brief by *Lecher, Michael, Whyte & Spohn* of Milwaukee, and oral argument by *Malcolm K. Whyte.*

The following opinion was filed December 5, 1939:

NELSON, J. In the interest of clarity and convenience, we shall consider the facts and the applicable law as though only the appeal of Elizabeth were before us. Clearly the decision upon her appeal rules the appeal by her father.

Upon the closing of the testimony, the defendant moved for a directed verdict. The court granted the motion. The motions subsequently made to declare a mistrial and for a new trial were denied. The plaintiff contends that the trial court erred in refusing to submit the case to the jury and in directing a verdict.

It is well settled that it is the duty of a trial court in a proper case to grant a nonsuit or to direct a verdict, and that when a verdict is directed the question on appeal is whether the trial court was clearly wrong. *Leckwe v. Ritter,* 207 Wis. 333, 241 N. W. 339, and numerous cases cited therein. In a recent case, *Rusch v. Sentinel-News Co.* 212 Wis. 530, 533, 250 N. W. 405, it was said:

"A verdict may properly be directed only when the evidence gives rise to no dispute as to the material issues or only when the evidence is so clear and convincing as reasonably to permit unbiased and impartial minds to come to but one conclusion."

The material facts favorable to the plaintiff must be summarized. At all of the times to be mentioned, the defendant owned and operated a dairy and stock farm in Waukesha county. He raised and kept a number of saddle horses which he let for hire to persons desiring to ride. He also let them for hire with grooms to children and to others who were inexperienced and who desired to be instructed in horseback riding. The defendant was an experienced horseman, hav-

ing ridden for approximately sixty years, and knew the characteristics of all of his horses. A Mr. Southcott had been employed by the defendant as general farm superintendent for about thirteen years.

The plaintiff, Elizabeth, in 1936, was a strong, robust, and active girl of the age of fourteen years. Early in the summer of that year she became desirous of learning to ride horseback. Her first lesson was at Cox's Riding Academy at Delafield. She was first shown how to mount a horse and then permitted to ride through the country on a dirt road. She had no special help or attendant. She rode in a group of five or six. The academy mentioned was located at a greater distance from her home than was the defendant's farm. Her parents, therefore, thought it would be more convenient to arrange for her to ride at the Pabst farm. Mr. Smith, her father, early in July, telephoned Mr. Southcott, with whom he was well acquainted, and asked whether the latter could provide private riding instructions for Elizabeth. He told Mr. Southcott that Elizabeth was fourteen years of age, was inexperienced in riding horses, and had had no riding instructions except one time at the Cox Riding Academy. He asked Mr. Southcott whether Elizabeth would be as fully and as well taken care of at the Pabst farm as at Cox's. Mr. Southcott stated that he would be glad to provide riding instructions; that three or four other girls of Elizabeth's age were receiving instructions at the farm; that one girl was three or four years younger than she; that the horses which would be furnished were safe and dependable, the sort which could be assigned to the youngest girl; that she would always ride with an instructor, a man competent to take care of her,—an experienced man who would be with her; that there was nothing to worry about; that a number of other girls from Oconomowoc were riding there and that Elizabeth would be given equally careful care. Mr. Smith stated that Mrs. Smith would bring Elizabeth out to the farm and make further arrangements. Mrs. Smith testified that she took Elizabeth out to the farm and at that time told Mr. Southcott

that she had been on a horse only once before and asked him if she would be perfectly safe, to which Mr. Southcott replied in the affirmative. This is substantially all of the testimony bearing upon the express-contract issue.

On the day that Mrs. Smith first took Elizabeth to the farm she was given instructions in riding on a mare named Emmy. The instruction lasted for about an hour, and was given within a riding inclosure, by a Mr. Jull, one of the defendant's grooms. A few days later a second lesson was given within the inclosure. During the first and second lessons Mr. Jull rode alongside of Elizabeth. Thereafter, Elizabeth took another lesson on Emmy, which was followed by two lessons on a mare named Vigilant (the mare involved in this action), one on a horse named Acrobat, and one on a horse named Model. The rides subsequent to the first two were in the fields. When Jull rode with her he used a "lead rein" most of the time. All of the rides were uneventful and nothing happened which gave rise to any complaint or criticism regarding any of the horses furnished. On August 7th, Elizabeth and a Mrs. MacFadden went to the Pabst farm to take another lesson. Mr. Jull was not at the farm that morning, and Mr. Dixon, another groom with whom Elizabeth had also ridden, was engaged in training horses for a show. Clarence Mair, a third groom employed by the defendant, who apparently had not served as a riding instructor as much as either Mr. Jull or Mr. Dixon, although he had served in that capacity a number of times at the Pabst farm, reported to Elizabeth and to Mrs. MacFadden that he had been directed to accompany them on their ride. On that day Elizabeth rode Vigilant for the third time and Mrs. MacFadden rode Emmy. They rode through the fields and into a sparsely wooded pasture lot, a distance of two to two and one-half miles from the stable, without anything happening. Upon entering the lot mentioned, Mair was ahead followed by Elizabeth and Mrs. MacFadden. Whether the latter two were riding side by side at the time does not clearly appear. Elizabeth testified that just prior to the inci-

dent about to be related, she may have been talking to Mrs. MacFadden. At about that time Elizabeth observed that Vigilant, proceeding at a walk, was going toward an overhanging branch which extended six or eight feet from the trunk of a tree. She "tried to lead her horse away from there" and then decided to stoop down under the branch. She bent her head low and shifted to the right side of her horse. Some of the branches struck her in the face and she lost her left stirrup and probably her right stirrup. Mrs. MacFadden, who observed her predicament, told her to drop off the horse. This she did with no resulting injury. Vigilant went on a short distance,—twenty-five to fifty feet, and then stopped and began to graze. Mair, upon discovering that Elizabeth had dropped off the horse, came back and inquired whether she was hurt. Shortly thereafter, he went after Vigilant. While he was gone Elizabeth and Mrs. MacFadden discussed whether Elizabeth should continue to ride Vigilant. They decided that if Vigilant was calm and unexcited when brought back Elizabeth should again mount and ride her. When Mair brought Vigilant back she looked perfectly calm and absolutely quiet. Mair thought that under the circumstances Elizabeth should again mount and ride Vigilant. He dismounted and held his horse and Vigilant while Elizabeth remounted. Elizabeth did not recall whether Mair assisted her in remounting. When she was firmly seated in the saddle with her feet in the stirrups and the reins in her hands Mair released his hold on Vigilant. According to Elizabeth's testimony, Vigilant turned around and proceeded about thirty feet in the direction from whence they had come. Elizabeth, however, had no difficulty in controlling Vigilant, in turning her around or in guiding her back to where Mair and Mrs. MacFadden were stopped. Elizabeth went by them without stopping and along a path. After going some distance away from them Vigilant started to trot and when Elizabeth observed that two trees ahead of her were rather close together she pulled on the reins and tried to steer away. Then she closed her eyes and waited.

Vigilant's gait was accelerated and Elizabeth either fell from or was brushed off the horse. As a result of her fall, Elizabeth sustained a fracture of the left leg near the hip, with serious complications and permanent disability. As soon as Mair observed that Elizabeth was going on ahead of them, and that Vigilant was traveling at a rather fast pace, he followed at a fairly rapid gait but avoided anything that might be considered by Vigilant as a horse race. On this particular ride, Mair did not have a lead rein with him.

Vigilant was foaled on the Pabst farm and at the time of the accident was six years old. She was described by Mr. Pabst, Mr. Southcott, the three grooms, and by Mr. Cox as a calm, well-behaved horse, without fault, bad habit, or vicious trait. Mair was an excellent horseman who had had about three and one-half years experience prior to being employed by the defendant about seven months before, in taking care of horses and in continually riding with the much younger children of his former employers.

In our view, we need not discuss at any great length the law applicable to the plaintiff's cause of action based upon express contract. It is clear that the conversations had by Mr. and Mrs. Smith with Mr. Southcott did not give rise to an express contract which differed materially from that which is implied in law when one lets a horse for hire for a particular purpose. Obviously, the defendant did not agree to become an insurer against any and every accidental injury which might befall Elizabeth while receiving riding instructions on defendant's horses. There will always exist some hazard in horseback riding as in most other sports. *Dam v. Lake Aliso Riding School,* 6 Cal. (2d) 395, 57 Pac. (2d) 1315; Id. (Cal. App.) 48 Pac. (2d) 98; *Troop A Riding Academy v. Steverding,* 39 Ohio App. 560, 177 N. E. 601; *Troop A Riding Academy v. Miller,* 127 Ohio St. 545, 189 N. E. 647. In *Troop A Riding Academy v. Steverding,* 39 Ohio App. 560, 563, 177 N. E. 601, it was said:

"We must bear in mind the distinction between a mere warranty and an insurance policy. The obligation which is

sought to be fastened upon the plaintiff in error in this case seems to us to be in the nature of an absolute guaranty against accident, rather than an obligation based upon a warranty."

Careful consideration of the conversations had between Mr. and Mrs. Smith and Mr. Southcott leads to the conclusion that those conversations cannot be said to have insured Elizabeth against any harm or injury whatsoever.

It is generally held, and the law may be said to be well settled, that when a livery-stable keeper or other similar bailor lets out a horse for hire he is under an obligation, sometimes spoken of as an implied warranty, to furnish a reasonably safe animal for the purpose made known to him, and that for a failure to use due care to discover dangerous propensities in such an animal or to disclose them to the hirer, he may be held liable for damages for the failure to exercise such care. See annotation in 12 A. L. R. p. 778. That rule is the very gist of the holding of this court in the recent case of *Vaningan v. Mueller,* 208 Wis. 527, 528, 243 N. W. 419, upon which the plaintiff so strongly relies. In that opinion, wherein many similar cases were reviewed, there is some language which, when considered apart from the whole opinion, might lead to the conclusion that liability in such a case may exist when it is shown that a horse so let has but once exhibited some vicious trait resulting in damage, without further proof. That was not the holding in that case. The real holding, as succinctly expressed in paragraph 2 of the syllabus, was that "the verdict finding that a saddle horse hired by a husband for the use of his wife had evil characteristics which the liveryman in the exercise of ordinary care could have discovered and that such evil characteristics caused injury to the wife, supported a judgment for the husband for breach of contract." In that case, the jury specifically found that the horse in question had evil characteristics; that the defendant in the exercise of ordinary care ought to have discovered and known of such evil char-

acteristics, and that the injuries of the plaintiff were caused by those evil characteristics. In that case, the plaintiff asked the defendant for three horses, two of which were to be ridden by beginners. He specifically asked for two gentle horses suitable for ladies to ride who were not used to riding. The printed case in that appeal reveals that the horse ridden by Mrs. Vaningan was one of fifty or sixty horses owned by the defendant Mueller; that Mueller did not personally take charge of the stables; that he knew nothing about that particular horse, had never ridden her and had never asked anyone about her, and had never made any effort to learn about her habits. It also appeared that a Mr. Schultz, who was in charge of the stables, knew nothing about that horse, had never ridden her, had never sent her out as a saddle horse, and had no knowledge of her habits or characteristics. Another witness testified that the horse had a determined habit of whirling about and going back to the barn, and that she was mean about that habit. He also testified that it was necessary to change bridles at one time in order to control her, that the horse had run away with him on one occasion in the same year, and that in his opinion as an expert the horse was not a safe horse on which a beginner should be allowed to ride. Still another witness testified that he once tried to ride that horse at the riding academy and that when he got on it it bolted at the corral at the side of the barn, and that it had to be tied with a rope in order to calm it down; that that horse was unmanageable when he tried to ride it, that he could not hold it back with the bridle, and that it was necessary to ride it about a block to get back and get another horse. These facts were not specifically stated in the opinion.

In this case there is not a word of testimony tending to show that Vigilant had any faults or vicious habits. The testimony is overwhelming that Vigilant was without fault so far as the defendant and his employees knew; that they had all ridden her and had never observed that she had any

fault or vicious habit. The fact that Elizabeth was brushed in the face by a branch of a tree six or eight feet from the trunk thereof cannot amount to proof of a fault or vicious habit on the part of Vigilant. Nor can it be said that because Vigilant started to trot after going some distance from where Mair and Mrs. MacFadden had stopped, a vicious or faulty characteristic was shown.

Viewing the evidence from the viewpoint of the allegations of the third cause of action which sound in tort, we are of the opinion that the evidence fails to establish negligence in furnishing Vigilant to Elizabeth. In *Troop A Riding Academy v. Miller,* 127 Ohio St. 545, 549, 189 N. E. 647, an action sounding in tort, the court said:

"A leading case, made the subject of an extensive note in 12 A. L. R. 774, is *Cooper v. Layson Brothers,* 14 Ga. App. 134, 80 S. E. 666. In that case it was laid down that: 'Livery-stable keepers who let animals for hire are bound only to exercise ordinary care and diligence in providing an animal suitable for the purpose for which it is hired."

To the same effect is *Conn v. Hunsberger,* 224 Pa. St. 154, 73 Atl. 324, 25 L. R. A. (N. S.) 372, 132 Am. St. Rep. 770, 16 Ann. Cas. 504.

It appears that there is little, if any, distinction in the applicable law, whether the action is grounded upon implied contract or warranty or upon negligence.

The plaintiff asserts that the jury could have found that Mair was not a competent, qualified, and experienced riding instructor. Mr. Smith testified that Mr. Southcott told him that Elizabeth would always ride with an instructor,—a man competent to take care of her,—an experienced man who would be with her. In our view, that agreement was in no manner violated. Mr. Mair, according to the undisputed evidence, was a competent and experienced groom, and had had at least three and one-half years' experience in riding with children much younger than Elizabeth, under his for-

mer employers. The evidence shows that a brief time after Elizabeth had remounted Vigilant, and after she was firmly in the saddle with her feet in the stirrups and with the reins in her hands, he released his hold on Vigilant, turned his back upon Elizabeth while he was remounting his own horse. In view of the fact that Elizabeth was fourteen years of age, and at that time had had at least eight hours of riding instruction at the Pabst farm and had ridden Vigilant on two prior occasions, negligence could not be grounded upon Mair's temporarily turning his back upon Elizabeth, or upon the fact that while remounting he did not have a lead rein on Vigilant, did not hold one of the reins in his hand, or have Mrs. MacFadden hold it. We apprehend that if Mair had at that time taken the superprecaution suggested such act would have been resented by Elizabeth as a wholly unnecessary act at that stage of her instruction in horsemanship. A number of experts were produced by both parties, most of whom approved of everything that Mair had done. One of them, however, testified that in his opinion Mair could not be considered a suitable instructor until he had had at least five years' experience. That testimony, in our opinion, was not sufficient to raise an issue as to Mair's competency in view of the wide experience he had actually had.

While deploring the unfortunate accident, as the trial court doubtless did, we can see no escape from the conclusion that under the established law, the verdict was properly directed in favor of the defendant.

*By the Court.*—The judgments in both actions are affirmed.

A motion for a rehearing was denied, with $25 costs in one case only, on February 13, 1940.