KOZLOWSKI, Plaintiff-Appellant, v. JOHN E. SMITH'S SONS COMPANY, Defendants-Respondents.

Supreme Court

*No. 76–368. Argued January 9, 1979.—*
*Decided February 27, 1979.*
(Also reported in 275 N.W.2d 915.)

For the appellant there were briefs by *Peter W. Bunde*, *Ronald L. Wallenfang* and *Quarles & Brady* of Milwau-

kee, and oral argument by *Mr. Bunde* and *Mr. Wallen-fang.*

For the respondent there was a brief by *Joseph D. Mc-Devitt, Terry E. Johnson* and *Borgelt, Powell, Peterson & Frauen, S. C.,* of Milwaukee, and oral argument by *Mr. McDevitt.*

COFFEY, J.   On February 27, 1974 Andrew Kozlowski was killed in an industrial accident at his employer's plant, Patrick Cudahy, Inc., of Cudahy, Wisconsin. The wife of the decedent brought a product's liability action against John E. Smith's Sons Co. (hereinafter Smith's), the manufacturer of the sausage stuffing machine that Mr. Kozlowski was in the process of cleaning at the time of his death. Following the conclusion of the testimony in the jury trial, the court granted the defendant's motion for directed verdict and dismissed the case. The plaintiff's motions for reconsideration, for directed verdict in favor of the plaintiff and for a new trial on damages were denied. The plaintiff appeals the judgment of dismissal entered on November 15, 1976.

On February 27, 1974 at approximately 6:30 a.m. Mr. Kozlowski was cleaning the last of eight sausage stuffers located in his work area. Mr. Kozlowski had five to six years experience in the job classification of sausage stuffer. His duties required him to clean each sausage stuffing machine before being put into daily operation. The cleaning was required because after the machines were hosed down nightly, a paraffin oil was applied to prevent rusting in the cylinders of the machines.

The stuffing machines used by Patrick Cudahy were manufactured by the defendant Smith's and were known in the trade as the Series 38, 500 lb. Buffalo air stuffers. The machine consists of a large cast iron cylinder measuring 3 feet in diameter by 4 feet high; inside the cylinder is a conformed piston weighing over 500 lbs.

The piston is not connected to a tie rod, but rather floats free within the cylinder. The piston is moved by air pressure, and, when the machine is operating, pressure may be maintained as high as 125 lbs. per sq. inch. The machine's full pressure capacity is 150 lbs. per sq. inch. However, when the pressure is raised above 140 lbs. per sq. inch a pressure release valve takes over to prevent the pressure from reaching its maximum. At the top of the cylinder there is a 200 lb. safety ring which has a smaller inside diameter than that of the piston or cylinder. When the stuffer is in operation a metal cover operated by a screw mechanism clamps the cover over the top of the machine. An air pressure regulator is located on the side of the unit to facilitate controlling the pressure by hand.

During a cleaning of the Buffalo air stuffer the machine's cover is removed and the piston is raised to the top of the cylinder, the safety rings keeping the piston in place. George Sawchuk, a co-employee, described the events prior to and after the accident. He explained that Mr. Kozlowski had raised the piston and was wiping it off when the piston burst through the safety ring. Sawchuk stated the room was immediately engulfed in ammonia fumes and water was spilling from the ceiling. Mr. Kozolowski had been knocked to the ground and efforts by employees to remove him were futile as the saturation of ammonia fumes was at a fatal level. He was eventually removed by firemen wearing oxygen masks and was pronounced dead on arrival at a local hospital. Upon examination of the body, the medical examiner determined the cause of death was ammonia asphyxiation.

Located above the machine were the ammonia pipes used to cool the sausage products. At the time of the machine's malfunction while under maximum pressure, the cylinder and the piston jutted beyond the safety line of the machine, fracturing the safety ring into five

pieces, one of which ruptured the ammonia pipes. Upon examination of the work area following the accident, five pieces of the safety ring were found on the floor. At this time the piston was resting in a tilted position at the top of the cylinder. Although the medical examiner found an area of swelling on the decedent's head, no medical testimony established that Kozlowski had been hit by pieces of the flying safety ring.

The particular age of the malfunctioning Series 38 Buffalo stuffer is in dispute. It was testified to that the machine was first marketed in 1938 and underwent no substantial change in design until 1971. At that time a by-pass valve was incorporated into the machine's design as standard equipment for economy as well as safety reasons. The by-pass valve was developed as an optional piece of equipment in July, 1946. Since that time the valve was advertised in trade publications and was listed on Smith's repair parts list as an optional device. The purpose of the by-pass is to prevent air pressure from rising above 10 lbs. per sq. inch when the machine is being cleaned. The 10 lbs. pressure is sufficient to raise the piston for cleaning. A Cudahy representative stated that the company had no knowledge of the safety by-pass valve's availability until after the accident.

It should be pointed out that a sales representative of Smith's testified to making two sales calls on the Cudahy plant between 1971 and February, 1974, but that he had not discussed the safety device with any Cudahy employee. Allegedly, this was because the respective Cudahy personnel, an engineer and purchasing agent, were otherwise occupied at the time of his calls. He further stated that it was the practice in the trade not to make advance appointments when calling upon plant personnel. The Smith's salesman did not at anytime follow up the sales calls with letters explaining the purpose of his visits during the time referred to.

The record disclosed that between 1943 and 1960 Cudahy had purchased from Smith's 16 Buffalo stuffers and none of these machines came equipped with the safety valve invented in 1946. Plaintiff's Exhibit 9 indicates that five Series 38 Buffalo stuffers had been purchased by Cudahy between 1943 and January, 1946, before the by-pass valve was marketed. However, the incomplete business records and files of Cudahy prevented the litigants from ascertaining the actual purchase dates of all but five of the machines, including the machine in question whose serial number could not be determined.

Evidence was received that the manufacturer's operation and maintenance instructions failed to set forth the per sq. inch pressure requirement necessary for the safety of the employee when cleaning the machine. A simple warning was contained in the instruction booklet and read: "Always avoid excessive pressures as they are apt to be harmful to the product." The instructions do provide for procedures to be used when conducting a full pressure test. Smith's head engineer, one Harold Schaller, testified that the pressurizing of the piston to operating conditions with the machine cover open was a misuse of the stuffer, as the machine's safety ring was not designed under any circumstances to withstand full pressure capacity of the piston in an open position.

Despite the absence of a manufacturer's suggested procedure for pressurization during the machine's cleaning, evidence reveals that sausage stuffers at Cudahy had established by custom and practice safety procedures known to Kozlowski and other full time employees. Mr. Sawchuk stated the following procedure was used: raise the piston to the top of the cylinder under 5–10 lbs. pressure; then completely turn the pressure off. Sawchuk explained that there was no specific rule on whether to turn the pressure off before or after the cleaning of the piston. Adolph Drobka, Cudahy's processing department superintendent, testified to the pre-accident existence of

verbal procedures for safe pressurization during cleaning; he did not specify the procedure but stated every stuffer knew of the instructions. James Treat, the safety director and utilities engineer at the Cudahy plant, testified that a post-accident investigation revealed that contrary to the accepted practice the air pressure throttle was found in a wide open position. Robert Lex, a Cudahy plant engineer, gave the opinion that if the Cudahy post-accident procedure for pressurization had been followed, the accident would not have occurred.

Evidence was also introduced that the machine in question had been in a state of disrepair for at least one year. Mr. Sawchuk stated that the piston would rise slowly and then stick 8–10 inches from the top and then "kind of go up quite a bit faster so you had to be careful." This malfunction was brought to the attention of the maintenance department on more than one occasion and the problem remained unsolved. Sawchuk stated he knew that Mr. Kozlowski was aware of the problem.

One Gerald Waldburger, a safety specialist for the Department of Industry, Labor and Human Relations, testified to making an investigation into the accident. He concluded that if the machine had been properly maintained by Cudahy the accident could have been prevented. Further, he considered that his conclusion concerning the employer's failure to keep the machine in good repair excludes the possibility that Kozlowski caused the accident. He saw no reason to evaluate the design adequacy of the machine as he had concluded the machine's disrepair was the cause of the accident. Cudahy was cited by OSHA for safety violations for failure to exercise safety precautions in not supplying gas masks in light of the presence of ammonia.

*Issues:*

1. Did the trial court err in directing a verdict for the defendants based upon the plaintiff's failure to introduce evidence sufficient to raise a jury question on whether:

a. the defendant manufactured an unreasonably dangerous product by failing to equip the particular machine with a safety by-pass valve which prevents an unreasonably dangerous condition created when the machine is fully pressurized without its protective covering in place?

b. the defendant failed to exercise ordinary care to render its product safe by manufacturing the machine without the safety device?

c. the defendant manufactured an unreasonably dangerous machine by failing to warn users of the defective condition when operating under maximum air pressure?

d. the defendant caused the existence of an unreasonably dangerous condition by failing to inform users of the defective condition and the availability of a safety device designed to prevent that condition?

2. If the trial court erred, is the plaintiff entitled to a directed verdict on liability issues against the defendant?

3. Whether the trial court erred in denying the defendant's motion to dismiss at the close of the plaintiff's evidence?

The case at bar is a products liability action wherein it is alleged that the defendant-manufacturer, Smith's, designed and marketed an unreasonably dangerous air compression sausage stuffer and that the manufacturer additionally failed to give adequate warning of the danger created by the design defect. In *Schuh v. Fox River Tractor Co.,* 63 Wis.2d 728, 218 N.W.2d 279 (1974) the allegations against the manufacturer were the same. Thus, that case is similar to this appeal wherein the court was also called upon to review a motion granting directed verdict in favor of the defendant. In *Schuh* the directed verdict was affirmed as there was sufficient evidence to support the trial court's determination that the plaintiff's contributory negligence was a matter of law equal to or greater than the defendant's in causing the plaintiff's

leg to become caught in the fan of a crop blower.[1] *supra* at 743–44.

The review standard applied by this court when a trial court's directed verdict is challenged, has been succinctly stated as:

### THE EVIDENCE IS REVIEWED IN THE LIGHT MOST FAVORABLE TO THE PARTY OPPOSING THE DIRECTED VERDICT.

" 'In determining whether or not the trial court was in error in failing to direct the verdict, this court must take that view of the evidence which is most favorable to the party . . . against whom the verdict was sought to be directed. *Schumacher v. Klabunde* (1963), 19 Wis. (2d) 83, 87, 119 N.W.(2d) 457; *Mueller v. O'Leary* (1935), 216 Wis. 585, 587, 257 N.W. 161.' " *Tombal v. Farmer's Insurance Exchange,* 62 Wis.2d 64, 68, 214 N.W.2d 291 (1974).

A trial court reviews a motion for directed verdict by applying the following standards:

### 1) THE PLAINTIFF'S EVIDENCE IS INSUFFICIENT TO SUSTAIN A VERDICT IN THAT PARTY'S FAVOR

" '. . . A verdict should only be directed against a plaintiff where plaintiff's evidence, giving it the most favorable construction it will reasonably bear, is insufficient to sustain a verdict in plaintiff's favor. [Citations omitted.]' " *Schuh v. Fox River Tractor Co., supra* at 733–34.

or stated differently,

---

[1] *Schuh v. Fox River Tractor Co., supra,* was litigated prior to the 1971 amendment to sec. 895.045, Stats., permitting a plaintiff's recovery if his contributory negligence is equal to that of a defendant's.

## 2) DIRECTED VERDICT SHOULD BE GRANTED WHERE REASONABLE MINDS CAN REACH ONLY ONE CONCLUSION

"'A case should be taken from the jury and a verdict directed against a party:

" ' " '. . . only when the evidence gives rise to no dispute as to the material issues or only when the evidence is so clear and convincing as reasonably to permit unbiased and impartial minds to come to but one conclusion.' " ' *Anderson v. Joint School Dist.* (1964), 24 Wis. (2d) 580, 583, 129 N.W.(2d) 545, 130 N.W. (2d) 105, citing *Smith v. Pabst* (1940), 233 Wis. 489, 288 N.W. 780, and *Rusch Sentinel-News Co.* (1933), 212 Wis. 530, 533, 250 N.W. 405." *Tombal v. Farmers Insurance Exchange, supra* at 68.

*Dippel v. Sciano,* 37 Wis.2d 443, 155 N.W.2d 55 (1967) is controlling upon a manufacturer's liability in a products action. Therein this court adopted the strict liability in tort standards announced in the Restatement (second) of *Torts,* sec. 402A, pp. 347–48 which recite the following:

"Sec. 402A. Special Liability of Seller of Product for Physical Harm to User or Consumer

"(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

"(a) the seller is engaged in the business of selling such a product, and

"(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

"(2) The rule stated in subsection (1) applies although

"(a) the seller has exercised all possible care in the preparation and sale of his product, and

"(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller."

The *Dippel* decision explained the impact of the Restatement standards and enumerated five elements that a plaintiff must establish in a products claim:

"The term *strict* liability in tort might be misconstrued and, if so, would be a misnomer. Strict liability does not make the manufacturer or seller an insurer nor does it impose absolute liability. From the plaintiff's point of view the most beneficial aspect of the rule is that it relieves him of proving specific acts of negligence and protects him from the defenses of notice of breach, disclaimer, and lack of privity in the implied warranty concepts of sales and contracts.

From a reading of the plain language of the rule, the plaintiff must prove (1) that the product was in defective condition when it left the possession or control of the seller, (2) that it was unreasonably dangerous to the user or consumer, (3) that the defect was a cause (a substantial factor) of the plaintiff's injuries or damages, (4) that the seller engaged in the business of selling such product or, put negatively, that this is not an isolated or infrequent transaction not related to the principal business of the seller, and (5) that the product was one which the seller expected to and did reach the user or consumer without substantial change in the condition it was when he sold it." *Dippel v. Sciano, supra,* at 459–60.[2]

The appellant contends that the Series 38 sausage stuffer was defective by design as it permits the existence of an unreasonably dangerous condition. It is argued that there is a substantial risk that the safety ring will fracture as it did in this case when continually struck by the piston while the machine is fully pressurized with its

[2] It was observed that strict liability in Wisconsin is akin to negligence per se, and treated for the purposes of applying the comparative negilgence statute similar to a violation of "safety statutes." *supra* at 461–62.

cover open. The appellants sought proof of this allegation by virtue of the 1946 development of a safety bypass valve that prevents pressurization of the stuffer beyond safety standards when the cover is removed. Smith's rebuts this argument claiming that the full pressurization of the machine with its cover removed is a misuse of the machine as the alleged hazard is nonexistent if normal operating procedures are followed. The manufacturer maintains that the hazard created when the machine is under full pressure is an open and obvious defect that does not render the stuffer unreasonably dangerous.

*Vincer v. Esther Williams Aluminum Swimming Pool Co.*, 69 Wis.2d 326, 230 N.W.2d 794 (1975) adopted the following Restatement comments as an explanation to the meaning of the first strict liability element of a "product in a defective condition unreasonably dangerous to the user":

" '*g. Defective condition.* The rule stated in this Section applies only where the product is, at the time it leaves the seller's hands, in a condition not contemplated by the ultimate consumer, which will be unreasonably dangerous to him.'
" . . .
" '*i. Unreasonably dangerous.* The rule stated in this Section applies only where the defective condition of the product makes it unreasonably dangerous to the user or consumer. Many products cannot possibly be made entirely safe for all consumption, and any food or drug necessarily involves some risk of harm, if only from over-consumption. Ordinary sugar is a deadly poison to diabetics, and castor oil found use under Mussolini as an instrument of torture. That is not what is meant by "unreasonably dangerous" in this Section. *The article sold must be dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics.*' (Emphasis supplied.)"

*Id.* at pp. 330–31.

The argument for a design defect is answered in the plaintiff's case with the testimony of Harold Schaller, Smith's Chief Engineer. Schaller testified that the safety ring was designed to withstand a piston impact of 40 to 45 thousand pounds per sq. inch but that the machine was not designed to resist a full pressure impact while the cover is removed. Schaller also stated that the engineering feasibility or state of the art in 1938 permitted the utilization of the safety by-pass valve with a minimal re-piping of the unit. George Sawchuk, an experienced sausage stuffer, and Robert Lex, a Cudahy vice President and engineer, concluded that the accident could have been prevented if the sausage stuffer had been equipped with the safety by-pass valve.

In support of their contention that the defect was open and obvious, Smith's relies upon Schaller's testimony that it is an unsafe practice and a misuse of the machine to pressurize a stuffer to normal operating capacity (80–125 lbs. per sq. inch) with the cover in an open position. The manufacturer also offered as evidence the testimony of Sawchuk and Cudahy supervisory personnel that 5 to 10 lbs. of pressure was all that was required to raise the piston for cleaning. Sawchuk testified that this was the customary procedure and this practice was followed by the deceased prior to the date of the accident. The supervisory employees explained that each stuffer received on the job training for cleaning the machine as described by Sawchuk.

In *Arbet v. Gussarson,* 66 Wis.2d 551, 557, 225 N.W.2d 431 (1975) it was highlighted that for a defective design condition to be unreasonably dangerous it must be found to be a hidden and not an obvious defect:

" '. . . It must be noted also that the design characteristics complained of in the instant case were hidden dangers, not apparent to the buyer of the car, and not

the subject of a manufacturer's warning. This is a different case, therefore, than a case where a plaintiff sues the manufacturer of a Volkswagen and complains that the car was designed too small to be safe. Such a defect could hardly be said to be hidden. . . . since the ordinary consumer would expect a Volkswagen to be less safe in an accident than, say, a Cadillac, the smallness of the car with the attendant danger would not per se render it inherently dangerous. Rather it must contain a dangerous defect whose presence an ordinary consumer would not reasonably expect.' " *Id.* at 557.

Were this court able to conclude that the evidence in this case demonstrated an obvious defect not unreasonably dangerous, the manufacturer would not be automatically relieved from liability. In *Dippel v. Sciano, supra* at 461–62, we indicated that contributory negligence is a proper defense to a products liability claim. In this case there was substantial testimony that Mr. Kozlowski had not followed the customary procedures used by sausage stuffers while cleaning the machine. The post-accident investigations found the pressure valve in a wide open position, contrary to all safety practices and procedures followed at the Cudahy plant. Sawchuk, a co-employee, stated that it was not necessary in the cleaning procedure to allow the pressure to build up to maximum capacity.

Despite the foregoing evidence we cannot hold that as a matter of law Kozlowski was more negligent than the defendant. In *Schuh v. Fox River Tractor Co., supra* at 741, it was recognized that there is a duty on a manufacturer to foresee reasonable abuses of the product:

" '. . . "Intended use" is but a convenient adaptation of the basic test of "reasonable foreseeability" framed to more specifically fit the factual situations out of which arise questions of a manufacturer's liability for negligence. "Intended use" is not an inflexible formula to be apodictically applied to every case. Normally a seller or manufacturer is entitled to anticipate that the product he

deals in will be used only for the purposes for which it is manufactured and sold; thus he is expected to reasonably foresee only injuries arising in the course of such use.

" 'However, he must also be expected to anticipate the environment which is normal for the use of his product. . . .' "

"Every manufacturer intends his machinery to be used *safely*. But it is not necessarily a complete defense to liability to show that the machine was being used otherwise. Under certain circumstances, misuse may constitute contributory negligence and thus be a factor in the comparison of negligence." *Id.* at 741.

The appellant claims the operating instruction accompanying the stuffer permits the full pressurization of the unit without the cover. Smith's claims the use of the machine at maximum pressure is a blatant misuse of the machine. The operating instructions outline in the following language four steps for a full pressure test:

"IMPORTANT—A full pressure test, when desired, should be conducted as follows:

"1. Arrange at least 6 spacers of equal height such as six 1″ machine nuts laid on edge around the piston.

"2. Raise the piston slowly until these spacers are firmly seated between the top of the piston and the bottom of the safety ring.

"3. Pour water on top of the piston and raise the pressure to normal operating pressure.

"4. Any leaks will be indicated by air bubbles escaping around the piston."

It is conceivable that reasonable men may differ on whether these instructions permitting a full pressure test and allowing the piston to continually strike the safety ring obscures the potential hazard that caused the fatality in this case. The respondents do not prove their obvious defect contention with reliance on their safety record. While Smith's may never have been sued for injuries resulting from a fractured safety ring, a jury may infer that the "few near misses" referred to in testi-

mony should have put the manufacturer on notice of a hidden danger.

The record also reflects that Cudahy may have been found negligent in causing the plaintiff's death. Testimony was given that Cudahy knew and permitted the malfunctioning of this machine to continue for more than a year. The malfunction was described as a condition wherein the piston would rise slowly, then hold at a point 8–10 inches from the safety ring and then propelled at high speed against the ring. A safety inspector for the state found the sole cause of the accident was the machine's state of disrepair. Furthermore, it was established that Cudahy was cited for OSHA violations for its failure to provide gas masks in a working area surrounded with ammonia piping. We do not hold the negligence attributable to Cudahy relieves the manufacturer of all responsibility for Kozlowski's death and on the state of this record, there is sufficient evidence to present a jury question.

The trial court apparently withdrew this case from the jury's consideration finding that a 35 year old machine constantly propelling a 500 pound piston under pressure of 140 lbs. per sq. inch against a 200 lb. metal ring constituted a Volkswagen-type defect as described in *Arbet v. Gussarson, supra.* Upon a review of the entire record we cannot conclude that as a matter of law the appellant failed to introduce evidence establishing the existence of a jury question on whether there was a defective condition unreasonably dangerous. Nor is the evidence sufficient to conclude that the evidence offered by Smith's to prove an obvious defect supports only that inference. We believe that the disposition of this case is controlled by the following:

"The standard for determining whether the trial court erred in directing a verdict was stated in *Zillmer v. Miglautsch* (1967), 35 Wis.2d 691, 699, 151 N.W.2d 741:

" '[T]his court must take that view of the evidence which is most favorable to the party (the plaintiff in this case) against whom the verdict was sought to be directed . . . . If there is any evidence to sustain a defense or a cause of action, the case must be submitted to the jury. . . . The weight and sufficiency of the evidence is for the jury . . . as is the weight to be given to the witness' positive or negative testimony . . . Furthermore, it is basic that the credibility of the evidence and the inferences to be drawn therefrom are matters for the jury. . . . If there is any evidence other than mere conjecture or incredible evidence to support a contrary verdict, the case must go to the jury. . . . Incredible evidence is evidence in conflict with the uniform course of nature or with fully established or conceded facts. . . . [Citations omitted]' "

*Samson v. Riesing,* 62 Wis.2d 698, 705–06, 215 N.W.2d 662 (1974).

and, further:

" ' "A verdict ought to be directed if, taking into consideration all the facts and circumstances as they appear in evidence, there is but one inference or conclusion that can be reached by a reasonable man." *Milwaukee v. Bichel,* ante, p. 66, 150 N.W.2d 419.' *Tombal v. Farmers Insurance Exchange, supra* at 68."

Accordingly, we hold that because more than one inference or conclusion could be drawn from the evidence reviewed as a whole, the case should have been submitted to the jury. Factual determinations were required on the issue of design defect and its interrelationship to product abuse and Cudahy's negligence. Due to the importance of the issue as raised by the facts in this case, we will proceed to discuss whether on the basis of strict liability or common law negligence, Smith's failed to warn of the alleged hazardous condition.

The duty of a manufacturer to warn of an alleged defective condition unreasonably dangerous, has been defined as follows:

" 'The duty to warn . . . is a duty to give warning which is adequate and appropriate under the circumstances.' Annot. (1961), *Products Liability—Duty to Warn,* 76 A.L.R.2d, p. 15, sec. 2. Moreover, it is generally recognized:

" 'Various general criteria against which a warning is to be measured to determine its adequacy have been stated by the courts. Thus, it has been said that a seller must give the purchaser of a dangerous article a warning that is accurate, strong, and clear, and readily noticeable.

" 'Any ambiguity in the language of a warning furnished in connection with the sale of a chattel is to be "construed against the one who chose the words used."

" 'The warning must be appropriate; implicit in the duty to warn is the duty to warn with a degree of intensity that would cause a reasonable man to exercise for his own safety the caution commensurate with the potential danger. From this it follows that the likelihood of an accident's taking place and the seriousness of the consequences are always pertinent matters to be considered with respect to the duty to provide a sufficient warning label, and that there is a particular need for a sufficient warning where there is a representation that the product in question is not dangerous.' 63 Am. Jur. 2d, *Products Liability,* p. 62, sec. 53." *Schuh v. Fox Point Tractor Co.,* supra at 739.

Heretofore, this court has not stated whether or not there is a duty to warn against every obvious defect. It is a matter of common knowledge Volkswagen does not have to warn that their cars are not as crashworthy as a Cadillac nor does the average person have to be warned that excessive amounts of sugar is dangerous to a diabetic. However, as we have earlier concluded the existence of a hidden as opposed to an obvious defect in the Series 38 Buffalo stuffer was properly a jury question. Therefore, the duty of Smith's to warn of the potential hazard should have been presented to the jury.

Even by virtue of the environment of the machine's usage in industry rather than the home, we believe reasonable men may differ as to whether or not Smith's

provided an adequate warning. The operating instructions recite only this warning. "Always avoid excessive pressure as they are apt to be harmful to the product." In the *Schuh* case we noted that a general warning on a crop blower to keep limbs away from power driven parts was insufficient to disclose the nature of a danger that resulted in the accident causing the amputation of the plaintiff's leg. In that case, the actual danger causing the harm was the machine's fan continued to operate after the power take-off lever was taken out of gear. Smith's warning is of similar character. The danger of an exploding safety ring may not be revealed because of the inadequacy of the general warning. A jury may reach a different conclusion, but we cannot say as a matter of law this warning was sufficient to apprise the user of the hazard.

The most troublesome aspect of this case is whether there is a continuing duty to warn of an alleged defective condition in light of the availability of a 1946 safety device. The safety by-pass valve was marketed in July of 1946 and became standard equipment on all Smith's sausage stuffers sold after 1971.

Smith's introduced evidence that the 1946 safety feature was advertised in trade publications that reached 100% of its customers. The device was also listed in the company's repair parts brochure as a safety attachment. It is this court's belief that a jury could reasonably have concluded that this notice of product availability was inadequate. The record demonstrates that because of inadequate maintenance of records and files by Cudahy they had no actual knowledge of the existence of Smith's safety device which would have prevented Kozlowski's death.

The sale of the sausage stuffer is to a limited market wherein the manufacturer should know of all companies

that own its product. Therefore, whether based upon the theory of strict liability in tort or a common law duty, a jury could find it persuasive that prior to the accident, a Smith's sales representative made only two visits to the Cudahy plant. On each occasion he failed for one reason or another to inform Cudahy of the safety by-pass valve and the hazard it was designed to prevent. The representative's own testimony is that these sales calls were made after 1971 when the safety by-pass valve had become standard equipment on all new machines.

We do not in this decision hold that there is an absolute continuing duty, year after year, for all manufacturers to warn of a new safety device which eliminates potential hazards. A sausage stuffer and the nature of that industry bears no similarity to the realities of manufacturing and marketing household goods such as fans, snowblowers or lawn mowers which have become increasingly hazard proof with each succeeding model. It is beyond reason and good judgment to hold a manufacturer responsible for a duty of annually warning of safety hazards on household items, mass produced and used in every American home, when the product is 6 to 35 years old and outdated by some 20 newer models equipped with every imaginable safety innovation known in the state of the art. It would place an unreasonable duty upon these manufacturers if they were required to trace the ownership of each unit sold and warn annually of new safety improvements over a 35 year period.

As noted, the sausage stuffer machine industry is far more limited in scope. Consequently, a jury in determining a manufacturer's duty in this restricted area must look to the nature of the industry, warnings given, the intended life of the machine, safety improvements, the number of units sold and reasonable marketing practices, combined with the consumer expectations inherent therein.

We recommend that the legislature review the noted problem of open-ended product liability. Presently, the statute of limitations for a products claim runs from the date of injury. Sec. 893.205, Stats. In light of the burgeoning number of product liability actions being filed each year, it may be advisable to limit a manufacturer's liability to a specified period following the date of manufacture. Legislation of this nature would substantially clarify products liability litigation as it would define the scope of defense claims—the state of the art, work hardening,[3] normal product wear and a user's failure to make timely repairs. We recognize that this problem was given consideration by the legislature during the 1977–78 session wherein it was proposed that a six-year statute of limitations be placed on product liability actions.[4]

The legislature has invited us to propose particular changes in the statutes, and has directed the judiciary committee, one of its permanent committees, to monitor our opinions for such purposes.[5] It is especially appropriate to accept the invitation where, as here, the problem is court made, but the solution is a matter for the legislature.[6] Section 893.205, Stats., was enacted before

---

[3] See: Jagmin v. Sinonds Abrasive Co., 61 Wis.2d 60, 211 N.W.2d 810 (1973).

[4] 1977 Senate Bill 440.

[5] Sec. 13.83(4)(a), Stats. provides:

"The judiciary committee shall make recommendations regarding those statutes which the state supreme court in an opinion states are in conflict or ambiguous or unconstitutional *or that a particular proposal for change is a legislative matter.* The committee shall make recommendations concerning those statutes which the court of appeals in an opinion states are in conflict, ambiguous or unconstitutional, unless the decision is reversed or the supreme court disagrees with the finding or statement of the court of appeals relating to the statutes." (Emphasis supplied.)

[6] The concurring opinion argues that it is presumptuous for this court to recommend any specific change in the statute. The

we adopted the doctrine of strict liability in *Dippel v. Sciano, supra.* Even though the literal language of the statute covers product liability actions, it is obvious that no one contemplated its application to an action for damages caused by the malfunction of a machine 35 years after manufacture.

We commend to the Wisconsin Legislature for its consideration a statute running from the date of manufacture. This suggestion may be the wiser course than the proposal to have the statute of limitations run from the date of sale to a person not engaged in the business of selling the product.[7] First, as for a manufacturer's liability, it more accurately represents the requirement in *Dippel v. Sciano, supra* at 459 that the "product was in a defective condition when it left the possession or control of the seller." Second, tolling the statute as of the date of sale presents proof problems for any plaintiff. Rather than requiring consumers to save every sales receipt, provide both the consumer and producer with serial number identification to ascertain the date of manufacture. In formulating this new statute of limitations, the legislature should take into account reasonable periods when the product will be held as inventory by the manufacturer, wholesaler and retailer.

On the other hand, the legislature may in its wisdom find that a statute of limitations running from the date of manufacture does not solve the problem and that the

concurring justice has, himself, authored at least one recent opinion for the court in which specific changes in statutes were recommended to the legislature. *Kubart v. State,* 70 Wis.2d 94, 233 N.W.2d 404 (1975).

[7] *Supra,* footnote 4. However, we note that on 9/26/77 an amendment was proposed calling for the statute of limitations running from "6 years after the date of initial purchase for use or consumption, or 10 years after the date of manufacture of the product, whichever is earlier."

enactment of legislation is required, providing that at the time the product enters the stream of commerce the limitation on future liability shall commence. For example, a period of 6 to 10 years from the time the manufacturer has shipped the goods or product to the ultimate purchaser or 6 to 9 years from the date of sale, lease or delivery of possession to the initial user. The time periods referred to in the above proposal are merely suggestions. The myriad of problems and solutions in this complex area of products liability law should be the subject of hearings and debates in the legislature in order to balance the scales of justice between the manufacturer and the consumer.

As indicated throughout this opinion, the issues of defective design, the duty to warn, product misuse and the failure to make timely repairs required jury determination. Thus, neither party was entitled to a directed verdict. We order a new trial on all issues. This appeal presents a classic example of a "close case" which requires the trial court to reserve a ruling on motions for a directed verdict until after jury submission and determination. *Samson v. Riesing, supra* at 700.

*By the Court.*—Judgment reversed and cause remanded for a new trial.

HEFFERNAN, J. (*concurring*). I agree with the court's disposition of this case. However, I disassociate myself from the *obiter dictum* in respect to a modification of the period of limitations.

It is indeed apparent that the open-ended period of limitations which commences to run on the date of injury causes problems and may, in some cases, result in substantial injustice. Nevertheless, any change in the method of determining the commencement of a period of limitations must be the result of a policy determination reserved for the legislature. It is presumptuous for this

court, which does not and cannot have the benefit of public hearings and constituent expression of opinion, to "commend" *sua sponte* any specific change in the applicable period of limitations. It is enough for us to note that the determination of a period of limitations in respect to products liability presents a substantial problem, worthy of the legislature's consideration.

I am authorized to state that Justice DAY, Justice ABRAHAMSON, and Justice CALLOW join in this concurrence.

CONNOR T. HANSEN, J. (*dissenting*). I respectfully dissent for the same reason I dissented in *Chart v. General Motors Corp.*, 80 Wis.2d 91, 258 N.W.2d 680 (1977). Once again this court's application of the law of strict liability comes perilously close to making a manufacturer an absolute insurer of its product.

In denominating this a "close case," inappropriate for a directed verdict, the majority implies that a jury could have found, based on the evidence presented, that this machine was sold in a defective condition, unreasonably dangerous. The facts here do not support such a conclusion and the court does a disservice to the parties in sending them through a new trial. If the same testimony is adduced in the subsequent trial the ultimate result must be the same; the manufacturer will again be absolved. The majority's decision penalizes the manufacturer for requesting a directed verdict in a case which it had clearly won.

The court has frequently admonished trial courts that it is the better practice in close cases to reserve a ruling on a motion for a directed verdict until after the jury has considered the evidence and rendered a verdict. *Samson v. Riesing*, 62 Wis.2d 698, 704, 705, 215 N.W.2d 662 (1974). The majority's decision has the effect of holding that this admonition is no longer a guideline appli-

cable only to close cases, but a mandatory rule of procedure applicable to even the clearest of cases. If the instant case cannot qualify as one which the trial court can take from the jury, trial judges are not safe in taking any products liability case from a jury.

In reviewing a directed verdict the question for this court is whether the trial court was clearly wrong. A trial court may direct a verdict against the plaintiff where the plaintiff's evidence, giving it the most favorable construction it will reasonably bear, is insufficient to sustain a verdict in the plaintiff's favor. *Schuh v. Fox River Tractor Co.*, 63 Wis.2d 728, 733, 734, 218 N.W. 2d 279 (1974).

The plaintiff here had the burden of proving that the machine was sold in a defective condition, unreasonably dangerous. The plaintiff also had to rebut evidence that employee's contributory negligence outweighed the manufacturer's liability. *Schuh, supra,* at 744.

The plaintiff's case contained the following evidence. The machine was purchased between 1943 and 1960. The accident occurred in 1974, when the machine was between fourteen and thirty-one years old. Through the facts of the accident itself the plaintiff was able to show that at full pressure with the cover off the 500 pound piston broke through the safety ring. The manufacturer had developed a safety valve in 1946 which would maintain the pressure at a maximum of 10 pounds while the cover was off. This valve was made standard equipment in 1971. Personnel working at the plant in 1974 were unaware of the valve's existence. The manufacturer's instructions gave a procedure for *testing* the machine at full pressure, but did not indicate what pressure to use while cleaning the machine.

These facts simply do not make a case for defective condition, unreasonably dangerous on account of design defect or failure to warn. The majority has apparently agreed with plaintiff's theory that unreasonable danger

can be inferred from the fact that an accident occurred and the machine could have been made safer. I submit that if a jury so found on these facts it would be an abuse of discretion for the trial court to deny the defendant's motion for directed verdict or judgment notwithstanding the verdict.

The fact that an instrument is capable of being operated in such way as to inflict fatal injury does not make it *unreasonably* dangerous. The fact that an accident does result from such use is not proof that a defective condition existed. If these are the rules, car manufacturers should take heed and see to it that their products cannot be driven in excess of 55 m.p.h. The result in this case, together with the result in *Chart, supra,* leads inexorably to the conclusion that this court has adopted a rule of absolute liability of manufacturers for products that do not prevent the user from negligently injuring himself. It appears that all a plaintiff need do is show that the product is not as safe as it could be. The manufacturer's liability will follow, unaffected by the plaintiff's negligence in using the product.

In *Vincer v. Esther Wms. All-Alum. S. Pool Co.,* 69 Wis.2d 326, 230 N.W.2d 794 (1975), this court quoted the following definitions from the comments to sec. 402A, Restatement 2 *Torts,* 2d,

" '*g. Defective condition.* . . in a condition not contemplated by the ultimate consumer, which will be unreasonably dangerous to him.'

" . . . .

" '*i. Unreasonably dangerous.* . . *The article sold must be dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics.'* . . ." *Vincer, supra,* at 330, 331.

Given the industrial context in which this machine was used and the training which its operators underwent,

the machine was not unreasonably dangerous even though it could be fully pressurized with the cover off. The danger inherent in running the machine at full pressure with the cover off was obvious. In normal use the machine was operated with the cover on. The customary practice known to all those who operated the machine was to run the machine at low pressure while cleaning. Very specific procedures were set out in the instructions in order to conduct a high pressure *test* without the cover. No warning or safety device was necessary to put this machine in an acceptably safe condition.

" 'The duty to warn . . . is a duty to give a warning which is adequate and appropriate under the circumstances.' . . . .

" '. . . the likelihood of an accident's taking place and the seriousness of the consequences are always pertinent matters to be considered with respect to the duty to provide a sufficient warning label, . . .' " *Schuh, supra,* at 739.

In the absence of any indication that the machine was unreasonably dangerous without the safety valve, the manufacturer cannot be faulted for not making that valve standard equipment until 1971. Buyers were informed of the availability of the valve through ads, flyers and a boldface heading on the parts list. The majority's opinion seems to suggest that a manufacturer must personally demand that a buyer install an optional safety device in order to protect itself when the buyer denies knowledge of a widely advertised safety device that has been available for twenty-eight years.

Furthermore, given the obviousness of the danger, the manufacturer's negligence couldn't, under any view, outweigh the employee's. In *Schuh, supra,* this court sustained a directed verdict where it was evident that the plaintiff's negligence was greater than the manufacturer's as a matter of law. The employee in the in-

stant case had been employed to operate the machine for six years and was responsible for cleaning the eight machines in his area every day. The plant had well-established procedures for the cleaning operation which involved using only five to ten pounds of pressure to raise the piston. The employee knew of these procedures and also knew that this particular machine had been malfunctioning for over a year. It is undisputed that following the accident the machine was found to be set at full pressure. As a matter of law the employee's contributory negligence was greater than any liability that could be assigned to the manufacturer.

The majority suggests that the legislature consider enacting a statute of limitations for products liability actions. This must mean that the majority considers it somewhat inequitable to hold a manufacturer strictly liable for a product that could be as much as thirty years old. I agree that a statute of limitations may be necessary to provide manufacturers with some protection against judicial expansion of their liability. Unfortunately, such limitations lack the flexibility of judicial decisions and must bar both good and bad claims. Properly applied, through evidence of state-of-the-art and industry practice, sec. 402A can take the age of a machine into account in determining whether the machine is unreasonably dangerous.

In view of the court's concern for the time span involved here this may be a case suitable for the application of public policy reasons to cut off liability. Certainly allowance of recovery here will place too unreasonable a burden on the manufacturer and will enter a field that has no sensible or just stopping point. *Coffey v. Milwaukee,* 74 Wis.2d 526, 541, 247 N.W.2d 132 (1976).

In addition to the possibility of a legislative enactment of a statute of limitations as suggested by the majority, there are other possible solutions to this problem that

could appropriately be considered by the legislature. These would include the creation of panels or administrative agencies to perform a fact-finding function. Thus the expertise necessary to evaluate the technical evidence in products liability cases could be developed by an independent fact-finding panel or agency. Unless the judiciary is able to define "a sensible and just stopping point in products liability actions some legislative solution is necessary.

I would affirm the order of the trial court directing the verdict for the defendants.